CHISOLM et al. v. CAINES et al.

(Circuit Court, D. South Carolina. April 20, 1894.)

1. PUBLIC LANDS—STATE AS PROPRIETOR—SUIT AGAINST INDIVIDUALS—BURDEN OF PROOF.

Where the state of South Carolina (which, as successor to the British crown, represents the source of title to all lands within its borders) claims lands as against private parties, she is not, like an individual, required to prove her title in the first instance, the presumption being that she is the proprietor until the contrary is shown; but if it is made to appear by the opposite party that the lands have been granted, either by the crown of Great Britain or by the state herself, this presumption is overcome, and the burden is then upon the state to prove her title.

2. SAME—GRANTS BY STATE.

Marshes and mud shoals on the sides of harbors and streams, within the influence of the tides, may be granted by the state to private parties, when this can be done without interfering with the public rights of navigation in the streams and harbors themselves; and, in South Carolina, marsh lands of this character have always been treated as subject to grant. But as to public, navigable streams, themselves, the sovereign holds them in trust for the public use, and can make no valid grant thereof, such as would hinder or impede the rights of the public therein. Illinois Cent. R. Co. v. Illinois, 13 Sup. Ct. 110, 146 U. S. 456.

3. FEDERAL COURTS—RIGHTS OF STATE IN TIDE AND MARSH LANDS—LOCAL LAW.

The question as to the rights of the state of South Carolina in or over marsh and tide lands upon the borders of the sea or its estuaries is a question of local law, to be determined by the decisions of the supreme court of the state. Shively v. Bowlby, 14 Sup. Ct. 548, 152 U. S. 1, followed.

4. SAME—NAVIGABLE STREAMS—RULE IN FEDERAL COURTS—STATE DECISIONS.

The question as to what is or is not a public, navigable stream is one not of local or statute law, but of general law, as to which the federal courts are entitled to exercise an independent judgment.

5. FEDERAL COURTS—STATE DECISIONS—RULES OF PROPERTY.

Where the rights of a litigant in a federal court have arisen under decisions of state courts establishing a rule of property which has since been impaired or overthrown by a later decision of the state supreme court, the federal court will exercise its own judgment, without considering itself absolutely bound by the later decision.

6. NAVIGABLE STREAMS—TEST OF PUBLIC RIGHTS.

In determining whether streams and arms of the sea traversing marsh lands are public, navigable waters, the test is whether they are, or are capable of becoming, public highways; that is, a means, open to the pub-

lic, of passing from one place, where they have a right to be, to another, in which they have the same right. In other words, there must be a public terminus at each end, and hence partially navigable creeks which open upon a bay, but lead merely into private lands, are not public, navigable water. Heyward v. Mining Co. (S. C.) 19 S. E. 963, disapproved.

7. SAME—PUBLIC RIGHTS—PRESCRIPTION.

The fact that for many years the public have gone on creeks traversing private lands, without hindrance, does not create any right; it appearing that the lands have never been inclosed or staked out, and that such trespasses had never been forbidden, so that these acts of the public were not of an adverse character.

This was a bill by Alexander R. Chisolm and others, who held, under lease, a tract of marsh land, intersected by creeks, lying in Winyah Bay, S. C., against Edmund A. Caines and others, to enjoin them from trespassing upon said creeks and marshes, and shooting and driving away the game found thereon. Defendants set up in their answer that these creeks and marshes were subject to a public use. Pending the proceedings the state of South Carolina intervened, and set up title in the state to these creeks and marshes.

O. W. Buchanan, Atty. Gen., intervening on behalf of the state of South Carolina.

Fitzsimons & Moffett, for the motion.

Charles Inglesley, opposed.

SIMONTON, Circuit Judge. In this cause, still pending, the attorney general of the state of South Carolina has intervened by information. He alleges that neither the complainants nor their lessors, nor any of them, have, or ever had, any right, title, or interest in said marshes and creeks hereinbefore described, or any of them (the marshes and creeks set out in the bill of complaint). "On the contrary, the said marshes and beds of said navigable streams are, and have always been, the property of the state of South Carolina, absolute owner in fee simple thereof, and said state is now lawfully seised and possessed of the same as sovereign and source of title, said lands never having been granted." The defendants, in their answers, had denied the title of the complainants, averring that the lands upon which the alleged trespasses were committed were lands affected by public use; that is to say, lands open to use by the whole public. The basis of this contention is that these lands are what is known as "marsh lands," and are the beds of navigable creeks covered by water, certainly at certain times of tide, lying between navigable streams, and permeated by navigable streams; that so they remain always open to public use. The attorney general has come in to assert and vindicate this position, with others, under the authority of section 507 of the General Statutes. The prayer of the intervention was allowed, the state submitting herself to the jurisdiction of the court, and to all orders heretofore made in this cause. The defendants followed up this action by a motion that an issue at law be made up to try the question of title to the lands, and on this issue they ask that the complainants be the actors, and assume the burden of proof.

Under ordinary circumstances, the complainants being in pos-

session under color of title, holding adversely in the right of their lessors, upon ordering such an issue those who dispute their title should take upon themselves the burden of overcoming the presumption of ownership arising from possession. Patton v. McCants, 29 S. C. 597, 6 S. E. 848. But it is contended that when the state appears, claiming title to land, she occupies a peculiar position. She exhibits no paper title. Having once been the proprietor—the source of title—of all the lands of the state, she still owns them, unless she has parted with them. She is the sovereign, and upon this prima facie showing she can rest, at least until it is removed by a counter showing. State v. Pacific Guano Co., 22 S. C. 74. It is contended, therefore, that in the proposed issue the complainants should be the actors. There can be no doubt that all lands in this state are held under the sovereign,—first the royal authority of Great Britain, and afterwards the state of South Carolina, the successor to all of its rights. And when the state sets up her claim, prima facie the right must be in her. To require proof from her that she has not granted the land would require proof of a negative. The argument is plausible enough to be sound. At all events, we are bound by it, as the utterance of the supreme court of the state upon a local law affecting property rights. But the state of South Carolina succeeded to the obligations as well as the rights of the crown. She became, upon the Revolution, the owner of lands not granted by her predecessor. She is bound by those grants. This qualification is admitted even by the case of the Pacific Guano Company, which, under pressure of public opinion, carried the supposed rights of the state to an extreme limit. If it be shown that the lands had once been granted by the crown, the presumption in favor of the state is at an end, and upon those who assert her claims devolves the burden of proving either that the grant was void, or that subsequent thereto she had in some way reacquired title.

Let an issue be made up for trial on the law side of this court, in the form of questions to be submitted to and answered by a jury under instructions of the court: First: Were the lands, the subject-matter in controversy, ever granted by the crown of Great Britain, anterior to the Revolution of 1776? Second. If not, have they ever been granted by the state of South Carolina? (In this question the evidence of such a grant can be derived from prescription. In the evidence leading to the answers to these questions, the burden of proof is on the complainants.) Third. If such grants, or either or any of them, are produced or proved at the trial, then the presumption arising from the possession of the plaintiffs avails them, and the burden is thrown upon the defendants to show better title in some one else.

After the rendition of the foregoing opinion the state withdrew her intervention, and the order for the issue at law was rescinded. The case then came up on the bill, answer, and testimony, the issue being whether these creeks and marshes were subject to a public use.

(January 24, 1895.)

SIMONTON, Circuit Judge. This case now comes up for a final hearing upon the pleadings, and all the testimony in the cause. The complainants are in possession, under lease, of a large body of marsh land lying in Winyah Bay, in the state of South Carolina, opposite to the shores of North Island. Winyah Bay opens into the Atlantic Ocean, carries on its waters large commerce, and its channels are great public highways. North Island is at the outer entrance of the bay, on the east, and is a strip of land bounded on the east by the ocean, and on the west by marshes extending to Jones creek, and also by the waters of Winyah Bay, and by a part of that bay known on the chart as "Mud Bay." Mud Bay is a shoal to the right of, and at some distance from, the usual course of vessels going up Winyah Bay; the soundings upon it, at low water, being 1½ to 2½ feet, except in two or three places. From North Island to Winyah Bay and Muddy Bay is a vast body of marsh land, of the character shown on the whole coast of South Carolina. The soil is mud, of greater or less hardness, and over it is a growth of marsh, which is generally close together, and of an average height of 3 to 3½ feet. These marshes are permeated with creeks, some connecting with other creeks, making a continuous passage through the marshes; others rising from obscure sources in the body of the marsh, and emptying in the bay or in other creeks. The tide ebbs and flows in all of them. And the whole body of marsh land overflows with each high tide, the highest or storm tides over-lapping the growth on the land. In this margin of marsh land, of greater or less width, thus extending from the North Island to these bays, there is the body of marsh land in question in this case, separated from the North Island marshes by Jones creek. It has on one side of it, the eastern side, towards North Island, Jones creek, which runs along North Island from a small inlet at its northern end, and comes out on Winyah Bay, and which, it is admitted on all sides, is a navigable creek. On the opposite or western side of this land in question in this case is Town creek, which also starts from North Inlet, running westwardly. The coast-survey chart shows that it is a bold creek for some distance. It then becomes very narrow, but it appears to have a continuous channel to a point of junction with Oyster Bay, then going through to Muddy Bay, by a small creek, called "No Man's Friend." Coming from Muddy Bay through this to No Man's Friend, there is an abrupt turn to the east, onto a broad sheet of water in the marsh, known as "Oyster Bay." This Oyster Bay forms the southerly boundary of the land in question. Oyster Bay itself narrows as it extends eastwardly, and it has a connection with Jones creek by a very narrow channel, if it be a channel, called "Noble Slough." All the marsh between these creeks and Oyster Bay is cut up with small creeks, caused probably by the constant flux and reflux of the tide over it, acting as drains of the marsh land. Some of them have names,—"Mud Creek," "Duck Creek," "Bread and Butter Creek," "Sixty Bass Creek," "Cut-Off Creek," etc. One of these creeks drains the land by two entrances into Town creek, some distance apart. Others reach

out in the marsh, close up to the heads of other creeks, some of which empty into Jones creek, and others into Town creek. Of course, at high water, with the whole land flooded, any one, in a small boat, coming out of Town creek up one of these creeks, and going towards its upper end, can push over the marsh, and get into the adjacent creek, and follow that until he gets to Jones creek. These little creeks vary in depth. They are scarcely ever dry, except at low tide, and they will carry a vessel or raft of light draft in many stages of the tide. All the marshes on the coast of South Carolina present the same characteristics. The coast-survey charts give no soundings in any of these creeks.

The body of marsh in question comprises a part of the Carteret barony, and its grant from the crown bears date 1733. The grant refers to a plat, and on that plat the boundary is Winyah Bay. The grant covers the marshes, eo nomine. At the trial the original grant was not produced, nor was there any evidence of its existence, beyond an official copy, or of its loss. There was evidence that it was not in the possession, custody, or control of the complainants or the lessors. An exemplification of the grant, out of the office of the secretary of state, under the seal of the state, was put in evidence, and admitted. Rev. St. S. C. 1893, § 2360; Holmes v. Rochell, 2 Bay, 487; Patterson v. Winn, 5 Pet. 233; U. S. v. Sutter, 21 How. 175. As has been seen, the boundary of this land is Winyah Bay. Now, between the mainland and Winyah Bay is a navigable stream,—Jones creek,—a natural boundary. So the shore of the mainland cannot be said to be the boundary of the land granted. Beyond Jones creek, and nearer Winyah Bay, is another navigable stream,—a natural boundary. Yet the plat calls for the bay as the boundary. If Winyah Bay washed the shore of the mainland, it might be said that the boundary of the land was high-water mark on that shore. But such is not the case. This grant was direct from the sovereign, and must be recognized by the state,—the successor of the sovereign. Delassus v. U. S., 9 Pet. 117; Strother v. Lucas, 12 Pet. 410; Jones v. McMasters, 20 How. 8. It was distinctly recognized by the province of South Carolina, by an act of assembly (Rev. St. S. C. 1893, § 1876).

In the answer the title of the complainants is denied. And it is claimed that the marshes and streams in question are the property of the state, subject to the public use. With regard to the question of the title of the complainants, there being no evidence that the title is in a third person, it must be assumed that the title is in the party in possession. Patton v. McCants, 29 S. C. 597, 6 S. E. 848; Lewis v. Brown, 4 Strob. 293. At all events, mere possession will maintain an action for trespass on the possession, when defendant does not plead title in himself (Grimke v. Brandon, 1 Nott & McC. 356), and therefore will maintain a bill to enjoin repeated trespasses. Indeed, the case of the defendant may be complete even if legal title be in the complainants. His position is this: The marshes and streams in question are navigable waters, over and through which the public has the right to pass. The title of the lands underlying is originally in the state, but is held subject

to this publicum jus. Even if the sovereign has alienated them, its alienee takes subject to the same rights in the public as the state held therein. They are navigable waters because they form a part of the bed of an estuary of the sea,—Winyah Bay. There are two questions involved in this inquiry,—first as to the marshes, and next as to the creeks permeating them.

The right of the sovereign over marsh lands is determined by the local law. In an elaborate opinion, the supreme court, in Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, reviews the law of all the states, and concludes the review thus:

"The foregoing summary of the laws of the original states shows that there is no universal rule on the subject, but that each state has dealt with the lands under the tide waters within its borders according to its own views of justice and policy; reserving its own control over such lands or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it is considered for the best interests of the public."

In Lowndes v. Board, 153 U. S. 1, 14 Sup. Ct. 758, the court says:

"The questions in this case are mainly of a local character, in respect to which the settled rules of decision in the courts of the state are controlling. They relate to the form of action, the title of the plaintiff to submerged lands in Huntington Bay, and the special defense of the defendant."

See, also, Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838.

The uniform rule in South Carolina has been to treat marsh lands as subject to grant, to grant them, and to tax them when granted. 4 St. at Large, 627; 5 St. at Large, p. 39, § 4; 6 St. at Large, 7; State v. Pacific Guano Co., 22 S. C. 50; State v. Pinckney, Id. 488; Frampton v. Wheat, 27 S. C. 293, 3 S. E. 462; Oak Point Mines, 22 S. C. 593; Chamberlain v. Railroad Co. (S. C.) 19 S. E. 743. The grant in question covers the marshes, and has been recognized by the colonial assembly of the province of South Carolina. Nor is this in conflict with the general law. In Hale's Treatise, De Jure Maris,—"a great authority" (Shively v. Bowlby, 152 U. S., at page 11, 14 Sup. Ct. 548), chapter 6, under the head, "Concerning the Ownership in Property Which a Subject may Have in the Seashore and Maritime Increments, &c.," he says: "The seashore and the maritime increases belong, prima facie, to the king; yet they may belong to the subject, in point of propriety, not only by charter or grants thereof, there can be but little doubt, but also by prescription or usage." Discussing the shore of the sea, he says that there are three sorts of shores, according to the various tides: (1) The high spring tides at the equinoctial. The lands they overflow do not, de jure communi, belong to the crown; "for such spring tides many times overflow ancient meadows and salt marshes, which yet unquestionably belong to the subject, and this is admitted of all hands." (2) The spring tides, happening monthly. "The lands overflowed by these fluxes ordinarily belong to the subject, prima facie, unless the king hath a prescription to the contrary." (3) "Ordinary or neap tides, which happen between the full and change of the moon, and this is what is properly littus maris. * * *" Touching this kind of shore, viz. that which is covered by the ordinary flux of the sea, is the business of our present inquiry: (1) This may be-

long to a subject; (2) it may not only belong to a subject in gross, but it may be parcel of a manor; (3) it may not only be parcel of a manor, but, de facto, it many times is so. See Note to Mather v. Chapman, 16 Am. Rep. 60.

The law in New Jersey is like that in South Carolina:

"All navigable waters within the territorial limits of the state, and the soil under such waters, belong, in actual propriety, to the public. The riparian owner, by the common law, has no peculiar rights to this public domain, as incidents of his estate. The privileges he possesses by local custom, or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is that there is no legal obstacle to a grant by the legislature to the defendants of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high-water mark." Stevens v. Railroad Co., 34 N. J. Law, 532.

In City of Hoboken v. Pennsylvania R. Co., 124 U. S. 656, 8 Sup. Ct. 643, the question was as to the validity of a grant of marsh land in fee for exclusive use of the defendant. After a most elaborate and learned argument, the court gave its opinion, concluding:

"Under this grant the land conveyed is held by the parties on the same terms on which all other lands are held by private persons under absolute titles, and every previous right of the state of New Jersey therein, whether proprietary or sovereign, is transferred and extinguished, except such sovereign rights as the state may lawfully exercise over all other private property."

It would seem that there is a great distinction between the shores of the great ocean, the beds of harbors, the channels of rivers and highways of commerce, and these mud shoals cast up by the currents on the sides of harbors and streams. The former must always be kept open for public use, commerce, trade, and pleasure. The latter can be separated from any public use, and can be vested in individuals or corporations, at the will of the sovereign power. They are not aids to, but obstructions to, navigation, and can be utilized for the public good in any way the sovereign may decide. And, when it can be done without detriment to the lands and waters remaining, they can always be disposed of, and vested absolutely in private persons. Illinois Cent. R. Co. v. Illinois, 146 U. S., at pages 456, 457, 13 Sup. Ct. 110.

What of the creeks which penetrate these marshes? Although the sovereign can determine for itself, in the matter of marsh lands, and can grant them to private persons in fee, giving them title to the exclusive use of them, it is not competent for the sovereign to grant the exclusive use of public navigable streams, bays, and harbors, or the beds thereof, so as to prevent the use of them by the public for commerce, travel, or even pleasure. The title of the sovereign in public, navigable streams is subject to the public use. It is held by the sovereign as the representative of the public, and in trust for them,—a part of its prerogative rights, and not as private property. Martin v. Waddell, 16 Pet. 367. Nor can the sovereign, by any act, divest itself or the property of this public use. Every grantee from it is affected by the use. The only exception, perhaps, is the erection of docks and wharves, and piers of bridges, and the like, on the beds of navigable streams. See Dutton v.

Strong, 1 Black, 23. ' These are aids to commerce, navigation, and passage, and promote the public good. They are lawful, so long as they do not unreasonably impede the navigability of the stream. See Atlee v. Packet Co., 21 Wall. 389. The crucial question in this case, therefore, is: Are these creeks, or any of them,—those which bound and those which permeate these marshes,—public, navigable streams, or capable of becoming navigable streams? If they are, although they may have passed with the marshes which surround them, they are held subject to the use of the public for passage and navigation. Shively v. Bowlby, 152 U. S., at page 13, 14 Sup. Ct. 548.

What is the essential characteristic of a public, navigable stream? Not the bare fact that the tide ebbs and flows therein. Mayor of Lynn v. Turner, Cowp. 86; Glover v. Powell, 10 N. J. Eq. 223; State v. Pacific Guano Co., 22 S. C. 50. Nor does the answer to this question depend upon its depth, nor upon its width. It may have the capacity to float logs only, and yet may be a navigable stream. Gould, Waters, §§ 107–110. Nor does it depend upon an uninterrupted course, nor upon a channel free from obstruction, if these can be removed. · The Montello, 20 Wall. 430. Nor is it necessary that it shall at all times be passable,—floatable. Nelson v. Leland, 22 How. 48. That great interior highway extending along and within the Atlantic coast, behind the sea islands, from Virginia to Florida, constantly used for the purposes of commerce, and of inestimable value in time of war, in very many portions of the creeks, bays, sounds, and flats composing it, goes dry at low water, and in very many others has but an insignificant depth. Yet its waters are navigable waters of the United States. On the other hand, neither its depth nor width, nor uninterrupted course, nor freedom from obstruction, nor constant supply of water, nor an unvarying floatable condition, nor all combined, would in themselves make a navigable water. Else a pond or lake within the domain of a citizen, surrounded on all sides by his land, would be a navigable water. It is evident that to make a body of water a public, navigable stream, it must be accessible to the public. The essential characteristic of a navigable stream is that it is, or is capable of becoming, a public highway (Ball v. Herbert, infra),—a means open to the public of passing from one place, where they have a right to be, to another, in which they have the same right. The Montello, 11 Wall. 411, 20 Wall. 439. If the stream, in itself, or in connection with others, forms a continuous connection, in whole or in part, between different places in different states, it is a navigable water of the United States. But if it lies wholly within a state, and "is only navigable between different places within a state, then it is not a navigable water of the United States, but only a navigable water of a state." The Montello, 11 Wall. 411. This distinction simply determines the jurisdiction over it. The essential to navigability is the same in both,—a highway between places. In this connection it may be observed that the claim of the defendant that these small creeks are navigable streams rests upon the fact that they are a part of the waters of Winyah Bay, a navigable water of .

the United States, and that they open on creeks leading from that bay to the ocean. They also, if navigable streams, must be navigable waters of the United States. In Ball v. Herbert, 3 Term R. 253: "When once a river becomes navigable, or, in other words, when it is made a public highway." A public highway must have a public terminus at each end. In Young v. Cuthbertson, 1 Macq. H. L. Cas. 455, it is said: "Although a public way may pass through private property, it must have at each end a public terminus." That navigable streams are public highways is proved by abundant authority. In South Carolina they are put on precisely the same footing. Rev. St. 1893, § 1159. In State v. Duncan, 1 McCord, 404, the defendant was indicted for obstructing the mouth of a bold creek making out of Ashley river, within the limits of the city of Charleston. It was not disputed that Ashley river was a public highway, but it was not shown that the creek led up to or had a public terminus. This last was held essential to convict the defendant of obstructing a highway. In State v. Pacific Guano Co., 22 S. C. 50, the question at issue was the navigability of certain streams,—among them, Chisolm's creek and Big creek, two large creeks making up from Coosaw river into the Chisolm marshes. The judge below had found, as a matter of fact, that each of these creeks had one terminus on Coosaw river, a broad estuary of the ocean, but that there was no public terminus in either creek. "They are entirely in the private estate of the owners of the island, and made no connections with thoroughfares of travel or trade, and are none themselves. Flowing out of Coosaw river, with the tide, into Chisolm's Island, they lose themselves in the marshes with which they are surrounded." As a conclusion of law from this fact, he held that they were not navigable streams, and the public had no right in them. Page 57. This conclusion was distinctly affirmed by the supreme court. Page 77. In Attorney General v. Woods, 108 Mass. 439, the supreme court made the test of navigability neither the size of the streams, nor the character of the vessels on them, nor the motive of the public in using them, but the fact that they were highways through which the public could pass for business or pleasure. And in Glover v. Powell, 10 N. J. Eq. 221, it is evident the court entertain the same view. This also seems the ratio decidendi in Mayor of Lynn v. Turner, Cowp. 86. Lord Mansfield asks the question, "How does it appear that this is a navigable river?" He answers that the flux and reflux of the tide does not make it so, and then adds, what would seem to him conclusive, "The place in question may be a creek in their own private estate"; that is, being so, it cannot be used by the public as a highway, any more than a road running from a public road into the middle of a man's plantation can be. This same idea of the exclusive rights of a proprietor in a creek or other waters in his own private estate is illustrated in the act of assembly approved 24th December, 1892,—an act amending the act entitled "To prohibit non-residents from hunting, ducking, fishing and gathering oysters and terrapins within the limits of the counties of Georgetown, Charleston, Beaufort, Colleton and Berkeley." The act adds

Horry, and thus embraces every seacoast county in the state,—the only counties having salt marshes and salt-water creeks in which the tide ebbs and flows. The words "fishing, gathering oysters and terrapins" show that it speaks of water courses like these in question,—the home of fish, oysters, and terrapins. This act expressly provides:

"But nothing herein contained shall be construed as prohibiting any land holder from authorizing any person to hunt or shoot ducks or other game or to fish or gather oysters, other shell fish and terrapins within the boundaries of his own land." 21 St. at Large, 180.

All the cases concur in treating as the test of a navigable stream, that it is or can be used as a highway of commerce, over which trade or travel are or may be conducted in the customary modes of trade or travel on water. The Daniel Ball, 10 Wall. 557; Hickock v. Hine, 23 Ohio St. 523; Brown v. Chadbourne, 31 Me. 9. In order to be of use for the purposes of commerce, trade, or travel, the stream must be a means of intercourse and communication with points between which commerce, trade, or travel is conducted, and conducted by the public. The public may use any highway for any purpose of trade, travel, or pleasure. But it must be a highway. A broad road leading from a public highway through a man's land to his house or barn or fields, however capable it may be of sustaining travel by vehicles of any description, is not a highway. So a waterway into a man's land, surrounded on all its sides by his land, whatever its capacity, cannot be said to be a highway, and so open to the public for its use of trade, travel, or commerce.

There is a case in South Carolina which seems to conflict with these views. Heyward v. Mining Co. (S. C.; July 27, 1894) 19 S. E. 963. In that case the supreme court of South Carolina go beyond any case theretofore decided by them, and hold that a creek having an outlet on a navigable stream, and losing itself in the private lands of a citizen, which surrounded it on all sides, without another terminus, is a navigable stream to this extent, at least: that the state owns the phosphate rock in its bed. The decision of this learned tribunal are entitled to, and do receive at the hands of this court, the most profound respect. But this cannot relieve it of the discharge of its own duties. In all decisions pertaining to the construction of the statute laws of the state, of local customs, and rules of property, they will be followed without question. But in questions of general law, and in the application of common-law rules, alone, this court is not bound by state decisions. Chicago City v. Robbins, 2 Black, 418; Yates v. Milwaukee, 10 Wall. 506. And so, also, if there be a course of decisions upon questions which give rise to a rule of property, this court would follow them. Gormley v. Clark, 134 U. S. 348, 10 Sup. Ct. 554. But the question what is or what is not a public, navigable stream is one not of local or statute law, but of general law. Nor is there a course of decisions of the South Carolina courts which have made the result reached in Heyward v. Mining Co. a rule of property. That last decision is in clear conflict with other and older decisions of the same learned tribunal, and completely changes the law which was in existence

when the lease in this case was made, and the rights of the lessees had accrued and vested. In all such cases this court decides for itself. Justice Bradley, in the leading case of Burgess v. Seligman, 107 U. S., at page 33, 2 Sup. Ct. 10, lays down the rule which governs the federal court:

"The federal courts have an independent jurisdiction, in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that, by the course of their decisions, certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate, and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony, and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts, if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication."

Assuming, then, that to be a navigable stream, open to the public, the creek must be a highway, with a terminus ad quem as well as a terminus a quo, the inquiry is, are the streams in question navigable in this sense? Jones creek and Town creek unquestionably are. They lead in a continuous channel from the ocean, via North Inlet, into Winyah Bay. With regard to Oyster Bay, its name denotes that it is a broad sheet of water in the marsh, of varying depth. The coast-survey chart shows that it rounds itself off towards Jones creek, and is separated from it by Noble slough,—a name indicative of its nature. No doubt, at high water, one being in this bay can push himself over into Jones creek, and, at an unusual state of the tide, a boat can cross between them. But the evidence shows that but one vessel was ever seen to go in them, coming through from North Inlet, and then it was by mistake. It cannot be said, from this evidence, that Oyster Bay is useful for navigation. The same is the case with all the other creeks, except Bread and Butter creek. From the heads of all of them, a duck-

ing boat or an ordinary flat can be pushed over the marsh at certain stages of the tide. But they are not in the ordinary course of travel as highways, and, if anything, were in the nature of cutoffs. There is a strong analogy between this marsh land and a large body of highland bounded by public highways. So long as the land is uninclosed, or the public not forbidden, by signs, to use it, those passing and repassing on the highways can cut across from one to another. This is familiar to any one who lives in this state, and has been outside of incorporated towns. But no one has ever supposed that this sort of use establishes a right in the public to the body of land, as public highway, or that it by this becomes dedicated to the public. With regard to Bread and Butter creek: That leaves Town creek, forms an irregular arc, and returns to it some distance from its first entrance. It has two termini, each on a navigable stream. This meets the requisition, and constitutes it a navigable stream.

As a conclusion from all that has been said, Town creek and Jones creek, with Bread and Butter creek, are navigable streams. In them the public can enter and pass through at will, without let or hindrance. With regard to the other creeks, lying, as they do, wholly within the land of the complainants, with no regular outlet after entering therein, except over their land, they are not navigable streams, and the public have no right to be in them, except with their permission.

Stress has been laid on the fact that, for many years, persons have gone into these creeks, and have shot ducks in them, without hindrance. To create a right, there must be adverse use,—an assumption of the right against some denial of it. Trustees v. Meetze, 4 Rich. Law, 50. Speaking technically, no right can grow out of an act, unless the act itself would be a cause of action. Now, these lands have never been inclosed, and until a very recent period they have not been staked, and entry into—trespasses upon—them have not been forbidden. Hunting on uninclosed lands is not such an act as will support a trespass. Broughton v. Singleton, 2 Nott & McC. 338. And therefore a continuance of it will not ripen into a right. See, also, Jackson v. Lewis, Cheves, 259. Let the injunction be made perpetual as to all the streams but the three mentioned.