*124
 
 Ruffin C. J.
 

 This case, which was before the court at December Term, 1842, 3 Ired.
 
 277,
 
 has been brought up again, with some additional facts, which came QUt on a second trial. gu(. t[jey ¿0 not seem t0 vary the case materially.
 

 It was not competent to examine a witness as to the mean- t ing of a plain word in the contract; for that is a question of-) law determinable by the court.
 

 There are no sufficient grounds for the presumption of a grant by either the executive officers of government or by the legislature; even if one could be presumed under any circumstances. To say nothing more, the present plaintiff has much enlarged his seine, so that his use and that'of his grantors is not the same. But there really has been no continued and exclusive use of the fishery, as claimed by the plaintiff. He and those under whom he claims fished the waters at this place, it is true. But in so doing, they only exercised a right which,
 
 prima facie,
 
 belonged to them in common with all other citizens j and their fishing is referable to that right, and cannot, of itself, be a ground for presuming an exclusive right. To this latter purpose, it is necessary it should appear, that all other persons havé been kept out by the plaintiff and his grantors, not only from fishing with seines, but fishing in any manner in the waters to which the plaintiff lays claim. In that respect, the case is not made out at all. It appears, that it has been the common habit of Ibose, who chose, to fish in any waters of the Albemarle sound before a seine ground was cleared, and “a fishery established,” as it is called, by the owner of the beach ; and it has never been thought, that such fishing was an usurpation. Now, the owner of a several fishery has
 
 the property
 
 in the fish, and may maintain trespass for taking them.
 
 Smith
 
 v.
 
 Kemp, 2
 
 Salk. 637. Yet it does not appear, that any one was ever sued by any owner of his land for catching fish there, nor, indeed, that such an action was ever brought by any owner of land on Albemarle sound, either before or after he began to fish the water, to which his land was adjacent. The fact seems to be nothing more than that there has been some kind of understanding’among contigu- -
 
 *125
 
 ous riparian proprietors, for their own convenience, how they could and would exercise the right of fishing to the greatest advantage of, and with the least likelihood of interfering with, each other. But the interference, which they contemplated, was no.t an interference with a right, which one of them had as an exclusive right against all the world, but only an interference with his practical operations, in the exercise of the public right of fishing in this great water. The rest of the community has had very little to say or do in the matter, because, as they had no b.each, they could fish to little profit, and did not fish to the detriment .of the riparian owner to any serious extent. But it is clear, that the public at large have not yielded up the sound to the owners of the shore. The universal custom of fishing in any part of the sound, before the owner of the adjacent shore had there cleared out fishing ground, and doing so without a single action being brought, demonstrates that every body considered the right of such owner to the land to ¡re stopped at the wateres edge; and the forbearance, after the establishment of such fishery, to disturb the operations during the fishing season, is thus shown to be merely the deference of one neighbor to the convenience and greater interest of another. For it is impossible that any one could think, that one who did not, as owner of the adjoining land, also own the land covered by the water, and consequently have the right at all times to exclude persous from fishing within his waters, could, long after his grant for the shore,
 
 acquire
 
 the right to the land covered by the water, or the right of fishing there, by merely clearing out a bottom for the more speedy and secure fishing by a seine to be hauled up to his own beach. Such a mode of acquiring a several fishery, is novel and untenable. The case, therefore, is, as it was before, dependant upon the question, whether the plaintiff is the owner of the land, over which he hauls his seine, by virtue of his property in the shore adjoining.
 

 That is the proposition laid down in the case before, and we endeavored to shew, that the plaintiff was not such owner, because both thp common law forbad the grant of property in
 
 *126
 
 land covered by a stream or water, which in .that law was ca^ed navigable, and the statutes of this State, in like manner, forbid such a grant of land .covered by water, which in sfatutes jg denominated navigable; and because Albe-marle sound must certainly be deemed navigable in the sense ,of either the one or the other of those laws, if not of both of them. It has been argued, that the court reasoned illogically by treating things, essentially different, as having the same ■incidents, merely because they have the same name, though the name has different significations. .But that is a misapprehension of the argument, on which the judgment rests. It did not turn on the force and effect of the t,erm “navigable” alone and standing by itself; but upon the fact, that at common law
 
 the
 
 Zand .covered by navigable water, that is to say, an arm of the sea, or a river in which there is a flow and ebb of the tide,
 
 could not be
 
 granted, and that by the statute law of North Carolina,
 
 the same rule was enacted
 
 in respect to streams that were actually navigable by sea vessels, though they might not have a tide. In other words, our judgment Was given and plainly expressed to be given, because to constitute a several fishery,
 
 there must be a right of soil,
 
 and that no person has in Albemarle sound. There are rights of fishery without a right of soil. There is a right of fishery upon the high seas; but that is public, and belongs equally to all nations, and can be granted or restrained by no one in particular. There is also the right of fishing in navigable waters within the jurisdiction of a particular nation; and this right is
 
 prima facie
 
 public and common to all people of that nation. But, it seems, that, in England, ¡exclusive rights offish-ery, (merely, and without the right of soil) might be granted in such waters by the King at one time;
 
 but
 
 it is said, not since Magna Charta.
 
 Duke of Somerset
 
 v.
 
 Fogwell, 5
 
 Barn. & Cres. 875. But the right of several fishery, not derived by a special grant from thejCrown as above, or by prescription, (which supposes a grant) cannot exist independently of the right of soil. It was for
 
 that
 
 reason, that at common law ¡there could not be a several fishery in a navigable Stream.
 
 *127
 
 Lord Hale makes the right of fishing
 
 the consequence
 
 of “the propriety of the soil,” and Coke and Blackstone agree therewith. This plaintiff does not shew a grant, either for the fishery by itself, nor for the land over which he fishes. He
 
 shows only
 
 a grant for the land up to the water’s edge, as we must take it. Now, if there be a tide in the sound, the grant confessedly, cannot be carried into the water, beyond the special butts and bounds mentioned in the grant. That there is a tide, from the sea into the sound and back, is extremely probable, nay, mathematically speaking, is certain, upon the evidence of the respectable gentleman, who
 
 was
 
 called by the plaintiff
 
 to testify on
 
 this point. He proves the water
 
 to
 
 have been salt at Edenton, and that, at ashort distance below, within his memory, it was commonly so. Though not ordinarily perceptible to a common observer, it is unquestionable, that those must have been the effects of some tide; and any is sufficient within the rule of the common law. Tide is the ebb and flow of the sea; then as high as salt water is found, so high the tide, the flow of water from the sea, ascends. It could get there in no other way but from the sea. Indeed we know, that, although the rise of the water on the bars of our inlets is comparatively much less than in many other parts of the globe, yet there is a regular alternation of high and low water at all of them, varying at different inlets. That water, by the law of nature which makes it seek its level, will pursue its interior course, until it meets with land of an elevation greater than its own at crossing the bar. Its flow through narrow and shallow inlets may not always or generally be obvious, because, before it reaches its final obstruction, it may be, and, it seems, is merged from observation in the contrary currents, in these, immense masses of waters, produced by winds and large quantities of water discharged by long rivers with considerable descent. But the fact, that the salt water from the ocean sometimes reaches Edenton, without an eastern storm, shows mathematically, that that point is not above, .. hut, is below, the level of the rise of tide at the bar over which the waters of the ocean and of the sound intermingle, We
 
 *128
 
 say this is sufficient within the rule of the common law, which only requires a regular ebb and flow of tide, without distinguishing between the greater or less íisé; as of 100 feet in the ^ay
 
 0£
 
 pundy,'
 
 25
 
 or 30 at Bristol, or of 4 to 6 over the bars of North Carolina, or any less rise and fall. But we do not deem it important to insist on that point, because the statute of this State enacts, “ that the water shall form one side of the survey,” when an entry is made on a navigable water; and therefore, the same effect follows as to the right of soil, as if the sound were navigable in the sense of the common law, provided it be such a water as is called navigable in the statute. That it is navigable/ as that term was used by the legislature, is beyond doubt, for if it be not, then, as was asked in
 
 Wilson
 
 v.
 
 Forbes,
 
 2 Dev. 30, what navigable waters have we, which the legislature could have meant? The act prohibits the entry and survey of the land covered by the sound ; and, if it cannot be included in
 
 the
 
 survey and expressly granted, it must follow,-that it will not pass as an incident to the ownership of the adjacent soil.' Therefore, it is not the court that has transferred to waters, in which there is no tide, a quality or incident that at common law only attached to waters, in which there is a tide; but it is the statute itself, which affixes to the waters, which it deems navigable, and the land covered by them, the quality of not being grantable as private property. But it was said at the bar, that the legislature only meant by this provision to prevent an entry of land covered by such a water, by itself/ and rrot to interfere with the principle, that the owner of the adjoining land goes to the thread of a stream, in which'there is no tide. But that is clearly wrong; for the very subject of the enactment is the survey of iand lying on navigable streams, and “running back from the water,” and the case of
 
 Wilson v. Forbes
 
 was that of a survey of a tract of land, which called for a navigable creek as a boundary, and for that reason it was held that the Iand stopped at the water’s edge, or did not go to the thread of the stream.
 

 Whether, then, Albemarle sound have or have not a rogu-
 
 *129
 
 iar tide, or whether we be guided by the rule of the common law, or by the injunction of the legislature, we must say, that there is no exclusive property in that great water, or in the land under
 
 it;
 
 and therefore, that the plaintiff cannot recover, and the judgment must be affirmed. *
 

 Per Curiam;, Judgment affirmed.