Curia, per

Wardlaw, J.
The various grounds taken by the defendant for a non-suit or new trial, have been considered by this Court in connexion with the parts of the report which relate *79 to them severally, and for the opinion of this Court, the observations made in the report will be adopted, wherever they áre approved and seem to require no addition.
The testimony of the surveyors furnishes an answer to the first ground for non-suit.
The second, third and fourth grounds for nonsuit are answered by the evidence of possession by the United States, and the presumptions thence arising. The claim and possession were, according to the description of the deed from General Sumter to Mr. Jefferson, co-extensive with the grant to William Moore; and the presumptions establish the authority of Isham Moore to convey, and a conveyance from Mr. Jefferson to the United States, in effect a title in the United States to the land as it was originally granted.
The sixth ground for non-suit is sufficiently answered by the report; and to the observations there made in relation to the fifth, little need be here added. Two witnesses are ordinarily requisite to a conveyance of land in South Carolina. (Craig vs. Vinson, Cheves, 272.) But the Act of 1795, (5 Stat. 526) by the form it prescribes and the words, “ from one person to another or others,” used in its first section, shows that it contemplated only conveyances between natural persons, and must be construed so as to reconcile it with other law which regulates the mode by which acts of State shall be authenticated. Under the authority given by South Carolina to the United States (5 Stat. 260) to purchase “ the fee simple of any quantity of land, not exceeding two thousand acres, for the purpose of erecting arsenals and magazines thereon,” the jus disponendi passed with the fee simple to the United States, to be exercised whenever the purpose of the purchase had been abandoned or accomplished. It could be exercised only, as a Government performs alL acts, by some regularly constituted authority. The Acts of 1843 (11 Stat. 253, 272, and Res. 109) subsequent to the Act of Congress (1829, 4 Laws of U. S. 2170), which authorised the Secretary of War to convey the land to the State of South Carolina, recognized the sufficiency of the conveyance proposed to be made; and the *80 conveyance of the Secretary of War was the act of the head of a department having a seal, and was properly authenticated by that seal, and not by the attestation of witnesses. (1 Green. Ev. § 479.)
Of the grounds for new trial, the eighth is sufficiently answered in the report. As to the second, third and fourth, it is clear that the words used in the deed from the Superintendent of Public Works to the plaintiff, cannot derive any meaning, different from the ordinary legal signification, from the acts or words of the parties ; and that the words of the deed convey to the plaintiff whatever was then “ the remainder of the Mount Dearborn tract.” (3 Kent’s Com. 428.) This description extended the boundary on the east to the original boundary of the tract as it was granted in 1772. Much has been said of the fraud, which it is supposed would be consummated by the plaintiff’s now holding half of the river, after having, before his purchase, directed a survey to embrace only the land uncovered by water. It is easy to understand how the price of a whole may be fixed, by ascertaining the value of a prescribed part; but if it be conceded, that the plaintiff and the Superintendent both declared their intention to make the low water mark the boundary, the question is at last only whether any parol declarations shall avail to control the meaning of the writing, by which the intention of the parties was expressed. If a fraudulent contrivance, or mistaken use of words, has defeated the intention of the parties, they may have inquiries and adjudication between themselves ; but, they acquiescing, the deed subsists, and the question which a third person may raise is not, Should the deed be rescinded ? nor, Does it truly express the intention of the par-lies ? but, What does it mean ? The case of Noble vs. Cunningham (McM. Eq. 289) shews that corner trees marked on the river bank have not influence (where a river not technically navigable is the boundary) to stop short of the filum acquce the rights of a purchaser, whose deed refers to a plat shewing such corners.
The fifth, sixth and seventh grounds for new trial present the *81 points which have been most debated, and the questions under them will be considered without regard to the order which they indicate.
The possession of the defendant of the rock for a month or two every Spring, was not such a continuous possession as could give to him a title under the statute of limitations. (Jackson vs. Lewis, Cheves, 260.)
No presumption'of a grant to the defendant of either the rock, or of a right to fish at it, can arise from the use which he and those under whom he claims made of the rock; for the use was permissive, accompanied by such distinct acknowledgment of right in another as the payment of rent implies, and interrupted by change of claimants without transfer of title.
The rock in question is west of the main channel, which runs between it and Hill Island, but it is doubtful whether, in a line perpendicular to the river-bank, the rock is nearer to the island or to the bank; it is, however, far west of the middle of the river, measuring from bank to bank across the island. The jury were instructed that, under these circumstances, the rock was west of the medium filum aquae: and to that instruction objection is made. The evidence shewed that the water west of the rock was shallow, and that in dry summers much of it disappeared ; the low water mark may have been, as Mr. Aiken thought it was, nearer to the rock than the island was, but there was contrariety of testimony on this point, which the instructions rendered it unnecessary for the jury to consider. We must then look to the propriety of the instructions. The situation of the main channel, whether east or west of the rock, is unimportant, for the ordinary low water mark on each side having been fixed, the medium filum aquae is ascertained by measurement across, without regard to the depth of the water. The question then is whether the measurement to fix the boundary of plaintiff’s rights should be from his bank to Hill Island, or to the other bank of the river.
If the western margin of Hill Island belonged to another person, the exact boundary between that-person and the plaintiff *82 would be midway between the island and the western bank of the river. But islands in rivers, like rocks, (which are only small islands,) fall under the same rules concerning ownership which apply to the soil covered by water. This proposition, which Seems to have been established by a consideration of the instances of islands formed by alluvial deposits, embraces all islands, whether of recent formation or remote origin. (3 Kent Com. 427; 2 Bla. Com. 261; 4 Pick. 269; Harg. Law Tr. 5—36.) If they have not been otherwise appropriated by some lawful means, they belong in severalty to the owners of land on each side of the stream, according to the line of division which would have existed if they had continued under water. An island lying on one side of the filum aquae belongs to the owner of the bank on that side, if no opposing right to it has been lawfully acquired by another person. If it is situated so near the middle of the river that the original filum aquae, passed through it, and no opposing right has been acquired, it belongs to the owners on the two banks, according to the original dividing line.
Upon the supposition of there being nothing in the character of the river to forbid, the plaintiff’s right, under the grant of 1772, extended prima fade to the middle of the river, or original dividing line; and to rebut the title shewn by him, less evidence did not suffice as to the islands and soil covered by water which were included within his boundaries, than would have served as to his land on the western bank of the river. Now there was no evidence that the portion of Hill Island, which lies west of the original filum aquae, belonged to any third person: no grant of it from the State appeared, nor any such possession as could give a title under the statute of limitations. A claim of one Robinson, said to be under a sale made at Lancaster, was spoken of, but no papers were adduced nor any evidence given which shewed the validity of the claim to any portion of the island, much less to that portion which lies west of the middle of the river — that is the dividing line between the districts of Chester and Lancaster. Nothing then limited the plaintiff’s rights to the filum aquae between his bank and Hill Island, and the instructions on this head were proper.
*83 The jury have found that the Catawba river, where it is the boundary of the land granted, was not, in 1772, the date of the grant, navigable for boats. If it has since been made navigable, the right of the public to use it as a highway has been asserted, but the right of the grantee and those claiming under him, subject to the rights which the public have in the river as a highway or easement, continues to the soil granted ad filwm aqua., as it vested at the grant. A subsequent improvement of the river, or change of the law relating to the soil of rivers, could not divest the rights of soil which had been granted, further than was required for some public purpose.
The jury have also found that the river, where it is the boundary of the plaintiff’s land, was not, at the time of the alleged trespass, navigable for boats — and this, too, upon the supposition, that, if a portion of it above and a portion below was so navigable, then the intermediate portion obstructed by falls must have the same legal character. It follows that even if all rivers navigable for boats are held juris publici for fishing as well as for navigation, and if a right to fish includes a right to fasten a boat to a rock which rises above the water wherein the right exists, still the defendant is not justified in his trespass upon the plaintiff’s soil by the right to fish at the rock in question.
It is, however, urged by the defendant, that it was not for the jury to decide whether the river was navigable; that it is made navigable by Acts of the Legislature, and must be deemed by the Court to be so; and that therefore the soil of it is not the plaintiff’s, and, if it is, the defendant has the right of fishing in it which belongs in common to all citizens.
Various Acts of the Legislature, from the year 1753 to the year 1810, (7 Stat. 504, 532, 549, 562, 578; 9 Stat. 212, 254; 5 Stat. 94,) shew that repeated attempts were made to render this river navigable: and these Acts, by their very words, contain an admission that originally the river was not easily navigated by boats above the rafts which were below Camden, and that in the last mentioned year it was not navigable by any species of craft above the foot of the great shoals below Rocky Mount. Subsequent *84 legislation and the evidence taken in this case, shew, however, that between 1817 and 1830 large appropriations from the State Treasury were made for the improvement of this river above Camden, canals were made around the Rocky Mount shoals and other shoals, and up to the North Carolina line the river was treated by the public authorities as being fit for navigation, and was for a short time actually used by boats: and that the public works therein are yet somewhat preserved,- although disused. Since the year 1785, (5 Stat. —; 6 Stat. 340,) and perhaps before, there have been provisions made by law for keeping open fish-sluices on the river, and preventing obstructions to' the passage of fish. (The State vs. Thompson, 2 Strob. 12.) We will give to the public appropriations and to the instances of actual navigation the effect to shew that the river was, at the time of the alleged trespass, navigable for boats, or floatable (to use a word which Chancellor Kent has taken from the French) — and will even concede that the plaintiff is in no better situation than if his original grant bore even date with the deed from the Superintendent to him; still we are of opinion that the soil at the rock was the plaintiff’s, subject to servitudes for the public use, and that the defendant had not a right to fish there.
By the common law only those rivers were deemed navigable in which the tide ebbs and flows: and “grants of land bounded on rivers, or upon the margins of the same, or along the same, above tide water, carry the exclusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river : and the public, in cases where the river is navigable for boats and rafts, have an easement therein, or a right of passage as a public highway.” (3 Kent’s Com. 427.) “Where a stream is used in a grant as a boundary or monument, it is used as an entirety to the centre of it, and to that extent the fee passes. Prima facie, said the Vice Chancellor of England, the proprietor of each bank of a stream is the proprietor of half the land covered by the stream.” (3 Kent’s Com. 428 — citing 1 Sim. & Stewart, 190; 17 Piqk. 41.) But these settled principles of the common *85 law are said to have been changed in our State by adjudged cases, and reference is made to the case of Cates vs. Wadlington (1 McC. 580). To the judgment in that, case no one would impute error: in some of the observations which the opinion contains, sufficient attention seems not to have been given to the distinction between the proprietary interest which the State for the public use has in a public navigable river, and the easement, so essential to public convenience, which the public have in a river not navigable, yet fit to be used as a highway. The point really decided was, that a vendee cannot have an abatement for deficiency of quantity where the conveyance to him contains no warranty, and he is undisturbed in the enjoyment of whatever interest the vendor had in the whole land conveyed. Judge Nott, looking to the importance of preserving unobstructed the public right to use streams which might facilitate transportation, says that because of the greater length of our rivers than of the insular streams in England, the common law rule, which regards no rivers as navigable but those in which the tide ebbs and flows, “ will not do for uswhilst he declines to define what shall be considered a navigable river in this State, he ventures to say that “that, cannot be considered a navigable river the natural obstructions of which prevent the passage of boats of any description whatever.” Such, we may observe here, was the Catawba above the falls at the date of the grant to William Moore, and for a long time afterwards: and such, in the entire disuse and dilapidation of the public works, it is now and has been for more than ten years past.
The occasion does not require any exact definition to be now given of a navigable river, according to the law of this State, in which the ownership of the soil shall not belong to the riparian proprietors: perhaps the principal occasion of dispute on the subject has been the use of the term navigable, which has a popular signification different from the technical one which is given to it by the common law. We can, however, safely say, that no authoritative decision has yet been made in this State which has changed the common law on the subject. Arguments on *86 both sides, drawn from considerations of policy and the law of other countries, have been addressed to us. On one side are commendations of the common law rule, for its wisdom and careful protection of all rights involved, its adoption by many of our sister States which are traversed by large fresh water rivers, its Certainty, and the unquestionable authority on which it rests: on the other side are the examples of continental Europe, Pennsylvania, Alabama, and some others of these United States, the civil law, and inconveniences thought to result from subjecting to a rule which was formed for short and small streams, mighty rivers, upon which, as upon inland seas, ships that have crossed the ocean may be safely navigated far above the reach of the tide. (2 Conn. 481; 20 Johns. 99; .3 Dev. 61; 16 Ohio, 540; Angel on Water Courses, 14, 19; Hilliard on Real Prop. 92, 94, 139; 3 Kent Com. 428, 430, notes; 2 Binney, 475.) The rivers of our own State are not of remarkable magnitude, and whether we adhere to the common law definition or consider as navigable all rivers that may be navigated by sea vessels, or all that are by nature floatable, we hesitate not to declare that this Court, if it should feel itself at liberty, from considerations of public convenience, to assume legislative discretion in the matter, is not likely by any decision to extend the rules which, by the common law, are applicable to navigable rivers, to any stream above those falls which by nature obstructed the serviceable use of its water for transportation. Above those falls, as below, the right of the public to improve a river, and to use it as a highway, subsists: to that the proprietary right in the soil is subject; but so subject the proprietary right exists in the owners to whom it has been granted — above the falls, at any rate, as we may now safely say.
And so in regard to fishing in the rivers. “A right of fishing in navigable or tide waters is a common right. In rivers and streams not navigable as tide waters, the owners of the soil over which they flow have at common law the exclusive right of fishing, each on his own soil, unless some other person can shew a grant or prescription for a common of piscary, in derogation of the right naturally attached to the ownership at' the soil: and *87 such right is held subject to the public use of the waters as a highway, and to the free passage of fish, and in subordination to the regulations to be prescribed by the Legislature for the general good.” (3 Kent’s Com. 418.) The right of the State to keep open fish-sluices, and to provide for the passage of fish in all streams, is a public right familiarly exercised in this State ; but that, like the right to use the water for transportation, is consistent with, although superior to, the proprietary right in the owners of the soil, and differs altogether from that common right of fishing which belongs to every citizen in a river navigable by common law. If the public easement is satisfied by a part of the stream, or by its use at certain times, wh^te'Véf'i'eiri.ains belongs to the owner of the soil: but where/tfilua.íá' ¿e^lxSli|sive ownership of the soil, as in tide watej^t^'cómmon .ri^ft^of fishing extends equally to every part of t^'rivq£jan^p»afl W^es.
We have cases in which expra&Mr have been ffsed. that plainly shew the understanding oflhejJiadg'gjs-%dio used them, that in this State all rivers navigabja^qVboats ape'¡Juris publici for fishing: and under those cases, connecfda wim the public acts which shew that the Catawba above and below the rock in question has been considered navigable, the defendant attempts to shelter himself. He is right in saying that if the river is juris publici for fishing, its whole width from bank to bank is so: and that a public canal around shoals may be regarded as a small branch of the river running round an island suddenly formed: therefore, that if the common right of fishing exists above and below the shoals, it exists also at the shoals. But the points decided in the cases upon which the defendant rests, do not maintain the right he claims.
In Boatwright vs. Bookman et al. (Rice, 447,) the questions, concerning the legal character of the river, (which there was the Congaree, at the shoals round which the Columbia canal passes,) and concerning the ownership of the soil, were expressly reserved; but yet, in consideration of the right which the public had to use the river as a highway for transportation and the passage of fish, and in neglect of the distinction between a public easement in *88 private property, and a common right in things not subject to appropriation, it was taken for granted that “ the right of taking fish there was common in equal degree to the whole community.” The matter really adjudged was only that a plaintiff, who, under a license from the proprietor of the adjoining island, had placed a fish-trap so as not unlawfully to interrupt the navigation or the passage of fish, might maintain trespass against the defendants who broke his trap. This is altogether consistent with the rule which gives an exclusive right of fishing to the riparian proprietor, subject to the right of the public to have unobstructed the navigation and passage of fish in the river, but is not plainly reconcilable with the notion of a common right in every citizen to fish in every part of the river — which latter right seems to forbid the continued enjoyment by any one of permanent fixtures in the river for his exclusive benefit.
The case of Jackson vs. Lewis et al. (Cheves, 259,) (relating to the Catawba river at a place a little higher up in the same shoals that the rock now in question stands in,) again leaves undecided the questions which were reserved in Boatwright vs. Bookman, but holds the defendant answerable in trespass for destroying the plaintiff’s fish-trap; because, first, if the river was one in which there could be exclusive ownership of the soil, and of the right of fishing as incident thereto, the plaintiff’s grant was oldest; and second, if the river was like one navigable at common law, the defendant had unlawfully disturbed the plaintiff in Ihe actual enjoyment of that which was of common right, and which the plaintiff might therefore enjoy whilst he possessed it. The first view is, according to our opinion of the legal character of the river, conclusive; and in the judgment of this case, as of the two others we have examined, we entirely concur, whilst we dissent in each of them from some of the propositions that are advanced in the argument. It is thus seen that no case has been yet decided here which alters the common law as to the right of fishing in rivers where the tide does hot ebb and flow, any more than as to the ownership of the soil •.herein. We feel safe in saying, concerning the right of fishing, as we did con *89 cerning the ownership of the soil, that the common law is yet unchanged in this State — at any rate above the falls, which, in their natural state, obstructed the serviceable use of the rivers.
Looking, then, either to the finding of the jury upon the questions submitted to them, or to the deductions which the defendant has drawn from the public acts concerning this river, we see no reason to divest the plaintiff of the title which he has acquired to the rock in question, or to justify the defendant in the trespass he has committed on it.
The motion is dismissed.
O’Neall, Evans, Frost and Withers, JJ., concurred.

Motions dismissed.