12479

CAPE ROMAIN LAND & IMP. CO. v. GA.-CAR. CANNING CO. *ET AL.*

SAME v. SHELLMORE OYSTER PRODUCTS CO.

(146 S. E., 434)

*Messrs. Hamer & Crosland, Alfred Wallace, Jr.,* and *W. C. Martin,* for appellants,

*Messrs. Edward W. Hughes* and *Robert McFigg, Jr.,*

July 5, 1928.

The opinion of the Court was delivered by Mr. JUSTICE CARTER.

On the 25th of January, 1925, the Cape Romain Land & Improvement Company, as plaintiff, instituted two actions in the Court of Common Pleas for Charleston County, one against the defendants, Georgia-Carolina Canning Company and H. G. Leiding, and the other against the defendant, Shellmore Oyster Products Company, the purpose of which actions was to restrain the defendants from trespassing upon the lands described in the complaints, consisting of more than 34,000 acres, alleged to be owned by the plaintiff, by gathering and carrying off oysters from said lands, putting up signs and planting oyster shells thereon, and also for damages in the sum of $10,000.00 for the alleged acts of trespass.

The defendants in their answer denied the material allegations of the complaint, and further alleged that they held a valid lease from the Board of Fisheries of the State, acting under an Act of the General Assembly, covering all lands on which they were operating, and it may be stated in this connection that it appears from the record that the defendants were only operating between high- and low-water mark in the navigable streams on the lands in question.

It is agreed by the parties, as shown by the statement contained in the transcript, that the pleadings and evidence raised the following issues: (1) plaintiff's title; (2) plaintiff's title between high- and low-water mark in the navigable streams named; (3) had the defendant or defendants in either case trespassed; (4) the extent of the damage and relief the plaintiff was entitled to. By agreement, the cases, which were similar, were tried together, and referred to the Master of Charleston County only to take the testimony and report the same. The matter was heard by his Honor, Judge William H. Grimball, upon the testimony reported, and, after full consideration, Judge Grimball having reached the conclusion that the plaintiff had failed to prove title

to the land between high- and low-water mark in the navigable streams in question, gave judgment for the defendants and did not pass upon the other issues raised by the pleadings and the evidence. From the order of judgment for the defendants, the plaintiff has appealed to this Court, imputing error to his Honor, Judge Grimball, in the particulars alleged in plaintiff's exceptions, which will be incorporated in the report of the cases.

Since in the order of his Honor, Judge Grimball, only one of the issues raised was decided—the issue of "plaintiff's title between high- and low-water mark in the navigable streams"—should the appeal be sustained, it would be necessary to remand the case to the Circuit Judge for the purpose of passing upon the other issues raised under the pleadings and evidence, but, under the view we take of the case, the order of Judge Grimball should be upheld and the appeal therefore dismissed.

An examination of the transcript of the case shows the following agreed statement: "* * * The real question in each case was does the plaintiff have title to low water mark in the navigable streams named? The crux of the whole case is, has the plaintiff title to low-water mark in navigable streams, the testimony showing that all streams named were navigable, and there being no proof that any oysters were gathered or other trespass committed between high- and low-water mark on the shores of Bull's Bay, or in Bull's Bay?" With a view of answering this question, we have made a careful examination of the record and fail to find proof of title in the plaintiff between high- and low-water mark in the navigable streams on the land in question. Assuming that the plaintiff proved title to the lands described in the deeds introduced in evidence by the plaintiff, it does not follow that title was proved to "low-water mark in navigable streams" in question. Appellant contends that, under the language of the several grants of the state introduced in evidence, with which it alleges it has connected itself, it

owns the land to low-water mark in all tidal navigable streams, even though the wording contained in the deeds does not specifically so state.

In determining the extent of the boundaries of a body of land, the same rule does not apply to tidal navigable streams, such as those in question, that applies to the ordinary or non-navigable stream. When a body of land is bounded by a non-navigable stream, the general rule is that the boundary line is the middle of the stream, whereas, in the case of a tidal navigable stream, the boundary line is high-water mark, in the absence of more specific language showing that it was intended to go below high-water mark, and the portion of land between high- and low-water mark remains in the State in trust for the benefit of the public interest. The plaintiff's deeds give as boundaries of the lands referred to in the complaint the Atlantic Ocean, certain bays, islands, marshes, streams, etc., and do not give low-water mark as the boundary in any instance. In this connection, appellant contends that the plats of the lands described in the several deeds, and which accompanied the deeds, should have been considered by his Honor, Judge Grimball, in passing upon this issue. The transcript of the case contains this agreed statement on that point: "The testimony shows that no grant or any plat referred to in any part of the case contains the words 'low water mark,' except in one plat covering one of the Morrison grants, the surveyor (states?) that on Bull's Bay, an arm of the sea not a navigable stream, the line is at 'low water mark,' and on the same plat containing navigable streams, no such language is used, and there is no testimony that any oysters were gathered or cultivated, or any stakes driven in Bull's Bay." It is, therefore, clearly seen that the plats to which the appellant refers do not offer any additional proof on the issues under consideration.

In support of the views herein expressed, reference may be had to the following authorities: *Shively v. Bowlby*, 152

U. S., 1, 14 S. Ct., 548, 38 L. Ed., 331; *State v. Pacific Guano Co.*, 22 S. C., 50; *State v. Pinckney*, 22 S. C., 484; *Hardin v. Jordan*, 140 U. S., 371, 11 S. Ct., 838, 35 L. Ed., 428; *Heyward v. Farmers Mining Co.*, 42 S. C., 138, 19 S. E., 963, 20 S. E., 64, 28 L. R. A., 42, 46 Am. St. Rep., 702; *Morris v. United States*, 174 U. S., 196, 19 S. Ct., 649, 43 L. E., 946.

In the case of *Shively v. Bowlby, supra,* Mr. Justice Gray, as the organ of the Court, makes this reference to the rule in South Carolina: "In South Carolina, the rules of the common law, by which the title in the land under tide waters is in the State, and a grant of land bounded by such waters passes no title below high-water mark, appear to be still in force"—citing *State v. Pacific Guano Co.*, 22 S. C., 50; *State v. Pinckney*, 22 S. C., 484. In the case of *Hardin v. Jordan, supra,* in discussing the rule, the Court uses this language: "With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted inures to the State within which they are situated, if a State has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the State—a portion of the royalties belonging thereto and held in trust for the public purposes of navigation and fishery. * * *" In the case of *State v. Pacific Guano Co., supra,* Mr. Justice McGowan, in his opinion as the organ of the Court, gives this statement of the rule: "The doctrines of the common law as to the seashore and the soil lying under tidewaters and navigable streams were peculiar. The fundamental idea was that the property in the sea and tidewaters, and in the soil and shore thereof, was in the sovereign. * * * These are all channels in which the tide ebbs and flows, and as to such the well-established rule is that a grant of" such should give "title only to high-water mark." In the case of *Morris v.*

*United States, supra,* the writer of the opinion in that case refers to the reasoning of the opinion in the case of *State v. Pinckney, supra,* with approval.

The appellant contends that, if the grants in question do not go to low-water mark, they convey nothing, for the reason that at high tide practically all of the land is covered by water. We do not agree with this contention. In the first place, the testimony on which appellant relies as showing or tending to show that a large portion of the land is covered by water at high tide is not conclusive of the question. Neither does the fact that the land described in some of the deeds is referred to as marsh land, to which attention is called, settle the question. Then, too, there are other facts in the case to be considered. While a marsh is land usually wet and soft and commonly covered wholly or partly with water and is often referred to as a swamp, it is also known as a meadow which remains green during the dry seasons. 38 C. J., 1363.

In this connection, it may be mentioned that there are only two small tracts, one containing 1,040 acres and the other containing 3,684 acres, which are described in the deeds as a marsh, while the balance of the 34,000 acres is described as islands, sand islands and bank, except a 360-acre tract which is described as a tract of shell sand bank and marsh," being a part of Cassena Island. If the use of the word "marsh" is to be considered as significant in connection with about 5,000 acres of said land, then the terms "islands" and "sand banks" should be considered as significant in connection with the remaining 30,000 acres. Also, in considering the question presented, inquiry should be made as to whether or not the land involved is covered by water at high tide on account of the usual tide or under abnormal conditions.

By "high-water mark" is meant "the line on the shore which is reached by the limit of the flux of the usual tide"; that is, the high mark made on the shore as "the tide ebbs and flows twice in each lunar day," and

not the point reached at new or full moon nor when there is an intervening disturbance such as a storm or earthquake. The testimony in the record on this point is not satisfactory. Even should it be conceded that a large portion of the land described in the deeds in question is now covered by water at high tide, it does not necessarily follow that such was the case when the deeds were executed many years ago, for it is a recognized fact that such lands undergo rapid changes. What was an island when the deeds were executed in 1840 and 1855 may now be a marsh or land constantly or continuously covered with water. This would be no reason, however, for reading into the deeds a meaning not intended at the time of the execution.

Appellant also calls attention to the fact that on one of the plats there appears a note inserted by the surveyor to the effect that in one of the boundaries the "line is at the edge of low water." According to our view, no special significance should be attached to this. The notation by the surveyor was made with reference to Bull's Bay, one of the boundaries of a tract, and it does not appear that Bull's Bay is a navigable stream, and the notation so made by the surveyor could therefore have no bearing on the question involved in the appeal.

But the question before this Court is not whether appellant owns any land contained within the boundaries appearing in the several deeds, through which appellant claims title, but the question is, Has the appellant failed to prove title to the land between high- and low-water mark in the *navigable streams?* The question, too, is not, Has plaintiff offered any testimony tending to prove title to the land between high and low water mark in the *navigable streams?* Even assuming there was some testimony tending to prove title to the land between high- and low-water mark in the *navigable streams* (though the record does not warrant such assumption), whether such proof was established was a question for the Circuit Judge who passed on

the facts in a law case, to whom the facts were submitted instead of submitting them to a jury, and this Court cannot interfere with said finding, under the showing made in the record of the case.

We must bear in mind, as stated in the agreed statement of facts, that "the crux of the whole case is, Has the plaintiff title to low-water mark in navigable streams?" It is conceded for the purpose of this appeal that the plaintiff owns all of the lands contained within the boundaries appearing in the deeds executed by the agent of the State, unless such boundaries be construed to include lands between high- and low-water mark in the *navigable streams,* but, as we view the case, the plaintiff has failed to prove title to the lands between high- and low-water mark in the navigable streams, as held by the Circuit Judge, for the reasons we have stated above in connection with the authorities cited. The title to land below high-water mark on tidal navigable streams, under the well-settled rule, is in the State, not for the purpose of sale, but to be held in trust for public purposes.

We are therefore of the opinion that appellant's position is not well taken and that there is no proof of title in plaintiff to the land between high- and low-water mark in the navigable streams within the territory described in the complaints, as disclosed by the record.

As to the question of adverse possession upon which appellant relies, a careful examination of the record fails to disclose to us sufficient proof to substantiate the claim, and we think that Judge Grimball was right in reaching the conclusion that he did and issuing an order accordingly.

The appellant's exceptions are therefore overruled, and it is the judgment of this Court that the judgment of the Circuit Court be and is hereby affirmed.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES BLEASE and STABLER concur.

Mr. Justice Cothran (dissenting) : These two actions involve substantially the same issues, and were tried together by agreement.

For convenience, the action first entitled above will be considered; the conclusions as to its being applicable to the second action as well.

The plaintiff claims to be the owner of a number of tracts of tidal land near Charleston aggregating 34,290 acres, marsh land, valuable only for the propagation and gathering of oysters and other shellfish, upon which *between low-water mark and high-water mark,* it alleges that the defendants have trespassed by gathering and carrying off oysters, putting up signs, and planting oyster shells, to its damage $10,-000.00. In addition to its demand for the recovery of damages, the plaintiff asks for an injunction restraining the defendants from further acts of trespass.

The defendants deny in their answer the material allegations of the complaint, and allege that the Georgia-Carolina Canning Company is justified in its entry and operations, between low-water mark and high-water mark upon the lands in question, by a valid lease from the Board of Fisheries of the State covering all lands on which they have been operating.

By agreement the case was referred to the Master of Charleston County only to take the testimony and report it to the Court. This was done, and the case was then heard upon that report by his Honor, Judge Grimball, who, on May 29, 1926, filed an order adjudicating "that the plaintiff had failed to prove title to the land between high- and low-water mark in the said navigable streams and judgment is therefore rendered in favor of the defendant in both cases."

From a judgment entered upon this order in favor of the defendants, the plaintiff has appealed, upon exceptions which present the questions hereinafter considered.

As is stated in the transcript of record, the main issue in the controversy is whether the paper title of the plaintiff

covers any land upon the several tracts claimed to be owned by it, *above low-water mark,* upon which the alleged depredations of the defendants have been committed.

It appears to be conceded that all of the bays, inlets, creeks, and other waters by which the several tracts are bounded are tidal and navigable waters.

The plaintiff claims to trace its title to the several tracts in this way:

(1) A grant from the State to John Bowman, dated August 1, 1791, pursuant to the act establishing the mode of *granting vacant lands,* of February 19, 1791, purporting to convey "a plantation or tract of land containing *fifteen islands* * * * containing 16,992 Acres," bounded by Atlantic Ocean, Bull's Bay, and creeks and marshes, "together with all woods, trees, water courses, profits, commodities, appurtenances and hereditaments."

(2) A grant from the State to C. B. Northrop, dated July 2, 1855, in the formal parts identical with the Bowman grant, purporting to convey "a plantation or tract of land containing *1,040 Acres of marsh,*" bounded by certain creeks and lands of other proprietors.

(3) A grant from the State to John Lee and others, dated August 3, 1840, in its formal parts identical with the Bowman grant, purporting to convey "A plantation or tract of land containing 970 Acres" bounded by the Atlantic Ocean and other waters, described as a "Sand island and Bank."

(4) A grant from the State to John Lee and others, dated August 3, 1840, in its formal parts identical with the Bowman grant, purporting to convey "A plantation or tract of land containing 360 Acres," bounded by a bay and creeks, and described as "a tract of shell bank and marsh land," a part of Cassena Island.

(5) A grant from the State to Thomas Lynch, dated July 5, 1788, purporting to convey 5,560 acres, bounded by Atlantic Ocean, Bull's Bay, and certain creeks and inlets, de-

scribed as "An island known by the name of Big and Little Raccoon Keys."

(6) A grant from the State to Richard T. Morrison, dated September 1, 1860, in its formal parts identical with the Bowman grant, purporting to convey "A plantation or tract of land *containing a body of marsh land* in all 3,684 Acres" in St. James Santee parish, bounded by Bull's Bay. On the plat of this tract is a statement by the surveyor *that low-water mark was adopted as the line.*

(7) A grant from the State to Richard T. Morrison, dated September 1, 1860, in its formal parts identical with the Bowman grant, purporting to convey "A plantation or tract of land containing 3,684 Acres of *marsh land*," in Christ Church parish, bounded by Bull's Bay, and certain creeks.

The tracts described above as Nos. 1, 2, 3, 4, and 5, were conveyed February 19, 1891, under tax title deeds, by the Sheriff of Charleston County to H. P. Jackson, and were by him conveyed to the plaintiff in September, 1891.

The tracts 6 and 7 were conveyed by Richard T. Morrison to J. B. and H. T. Morrison, and by them to the plaintiff June 14, 1899.

The evidence very conclusively shows that practically every foot of the 34,290 acres (with the exception of 6.2 acres on Cassena Island), was entirely submerged at high tide.

The witness Chamberlain testified: "* * * The land was marsh land, that the high tide covered it."

Leland: "* * * Practically all of the marsh is covered at high water."

Everett: A surveyor had surveyed Island 14 of the Bowman grant, which was granted for 715 acres; *found only 223 acres at low water;* "that it was completely covered at high water"; that he had surveyed Cassena Island, 350 acres of which had been granted to John Lee and others, and that at high tide the entire island with the exception of 6.2 acres

was covered; that the 15 islands of the Bowman grant were entirely covered at high tide; that he would designate "the whole thing as marsh land with a few exceptions in Cassena Island (6.2 acres), and a *little bit* in Raccoon Keys and Cape Island."

Lofton: "With the average tide the marsh islands were pretty well covered."

R. L. Morrison: "At high tide with an ordinary tide there is very little marsh land out, it is out in spots."

Singleton: "* * * These lands are practically all covered at high water."

Webb: That these marsh lands are valuable for nothing except for oysters, clams, and crabs—fisheries.

An affirmance of the Circuit decree therefore means that land which the evidence shows was valuable only for oysters, clams and crabs, and presumably was purchased for that purpose, containing 34,290 acres, is "shrunk to this little measure," 6.2 acres, by denying to the plaintiff any right between low-water mark and high-water mark.

The State in executing the grant is presumed to have known the fact that the area was marsh land, that marsh land means land that will be covered by the tide, and that as a physical fact the grant will cover nothing if the line of the grantee's proprietorship is limited to the high-water mark. The State is presumed to have intended to grant *something;* to appreciate the principle, *"Ut res magis valeat quam pereat";* and, if necessary to comply with this principle the grant will be held to have conveyed that which only was available, the land to *low-water mark.*

There can be no question as to the correctness of the principle that, under ordinary circumstances, a grant by the State to land bounded by tidal navigable waters passes no title below high-water mark. *State v. Pacific Guano Co.,* 22 S. C., 50; *State v. Pinckney,* 22 S. C., 484; *Hardin v. Jordan,* 140 U. S., 371, 11 S. Ct., 838, 35 L. Ed., 428; *Heyward v. Mining Co.,* 42 S. C., 138, 19 S. E., 963, 20 S. E., 64, 28

L. R. A., 42, 46 Am. St. Rep., 702; *Morris v. U. S.,* 174 U. S. 196, 19 S. Ct., 649, 43 L. Ed., 946; *Shively v. Bowlby,* 152 U. S., 1, 14 S. Ct., 548, 38 L. Ed., 331. I do not believe, however, that this principle can justly be applied where the State is presumed to know that, if this rule be applied, its solemn grant, with the great seal of the State affixed, is but a "scrap of paper."·

If there was nothing in these islands and marsh lands which the State, by reason of the fact that they were entirely submerged at high tide, could convey except the land bounded by low-water mark, common fairness would require that the grants should be so construed.

In *Shively v. Bowlby,* 152 U. S., 1, 14 S. Ct., 548, 38 L. Ed., 331, the Court said: "It is equally well settled that a grant from the sovereign of land bounded by the sea, or by any navigable tide water, does not pass any title below high-water mark, *unless either the language of the grant,* or long usage under it, clearly indicates that such was the intention."

How could the language of the grant in connection with the environment more clearly indicate the intention of·the State to extend the limits of the granted land to *low-water mark?* Take the Bowman grant, for instance: 15 islands in a network of bays, inlets and creeks, bordering on the ocean, not an inch above sea level, every acre of which was submerged at high tide; the grant conveying the entire area "with all woods, trees, waters, water-courses, profits, commodities, appurtenances and hereditaments"--high "sounding brass and tinkling cymbals" to convey absolutely nothing if the limits of the granted land be high-water mark. As a matter of fact, there was no high-water mark to the premises; it had passed over the entire area, and was registered somewhere on other lands further to the north. Or the Northrop grant, which conveyed 1,040 acres "of marsh." Or the Morrison grant, which conveyed 3,684 acres *"of marsh land* in Christ Church parish. Or the Morrison grant, which conveyed "a body of *marsh land* in all 3,684 Acres"

in St. James Santee parish, and specifically stated on the plat that the lines were fixed at *low-water mark*.

The cases cited, establishing the general rule as stated, all involved tracts of land upon which there was land of both descriptions, above and below the high-water mark; in the absence of a specific extension to low-water mark, it was but logical to declare the rule establishing the high-water mark as the limit of proprietorship. When, as in the case at bar, there is no high-water mark, and of course no land above it, the logic fails; the grant can have no effect at all unless the limit of proprietorship is extended to low-water mark.

There is a marked distinction between grants of land between high- and low-water mark, which is considered the "shore," and grants of land that is always submerged, land below low-water mark. The first class is considered vacant land, and may be granted by the public land authorities as such; the second class is considered a part of the sovereign possession of the State, in trust perpetual for the benefit of the public, and may not be granted except by an act of the General Assembly.

It is settled by the decision of this Court in the case of *State v. Pacific Guano Co.*, 22 S. C., 50, which refers with approval to a Circuit decree of Judge Maher in the case of *State v. South Carolina Phosphate Co. alias Oak Point Mines*, reproduced in the appendix, 22 S. C., 593, that the area between high- and low-water mark is classed as vacant land, and may be granted by the land authorities of the State without the necessity of an act. The distinction between such land and that below low-water mark, always submerged, is clearly drawn.

In the *Pacific Guano Co. case*, the Court said: " * * * The beds of such channels *below low-water mark* are not held by the State simply as vacant lands, subject to grant to settlers in the usual way through the land office. * * * Not being * * * subject to grant in the usual form under * * * the statute regulating vacant lands, it would seem to follow that

in order to give effect to an alienation which the State might undertake to make it would be necessary to have a special Act of the Legislature expressing in terms and formally such intention." That states the law clearly as to land below low-water mark, always submerged.

In the decree of Judge Maher, the land between high- and low-water marks is referred to, and the law applicable thereto is declared. It is said: "It appears therefore that there is nothing in the legal signification of the term, 'vacant land,' to restrict its application, so as to exclude land covered by water, which has not been appropriated to individual or public use, by authority of law. That land *flowed by the tide* [that is, land between high and low water marks], is the subject of grant in this State is conclusively shown by statutes in which 'all lands granted in this State' were classified and rated for purposes of taxation. * * * There is no trace of any special legislation providing for the location and grant of lands of this character, and the necessary inference is that they were disposed of under the general regulations prescribed by the statutes relating to vacant lands."

It seems to me clear therefore that all of this land limited by low-water mark was subject to grants by the State as vacant lands and was conveyed by the proper State authorities, that the State intended to convey all that it possessed, which was the entire islands, with the exception of the land below low-water mark, and that the plaintiff has established its title thereto.

I think, therefore, that the decree of the Circuit Court should be reversed, and the case remanded to that Court for a new trial. Nothing herein contained is intended as an adjudication of any issue of fact; all such issues are intended to be left open for such a new trial.