0395

STATE of South Carolina, ex rel. Daniel R. McLEOD, Attorney General, Appellant, v. SLOAN CONSTRUCTION COMPANY, INC., Respondent.

(328 S. E. (2d) 84)

Court of Appeals

*T. Travis Medlock,* Atty. Gen., *Daniel R. McLeod,* Retired Atty. Gen., *Kenneth P. Woodington* and *David C. Eckstrom,* Asst. Attys. Gen., Columbia, *for appellant.*

*C. Thomas Wyche* and *Bradford W. Wyche* of *Wyche, Burgess, Freeman & Parham, P.A.,* Greenville, *for respondent.*

Heard March 22, 1984.

Decided Feb. 13, 1985.

BELL, Judge:

The State of South Carolina commenced this action on the relation of its Attorney General seeking a declaratory judgment that it owns a portion of the bed of the Broad River in Union County from which Sloan Construction Company, the riparian proprietor, has been mining sand. The Broad River at the site in question is a nontidal, navigable stream. The circuit court held that Sloan owns the riverbed to the center of the river. The State appeals. We affirm.

The material facts are undisputed. Sloan holds title to approximately 330 acres of land along the Broad River in Union County. Within Sloan's tract is a parcel originally granted by a North Carolina Crown Grant to one Samuel Torbert in 1767.[1] That grant conveyed:

---

[1] The North Carolina-South Carolina boundary as far west as the site in question was not established until 1772. *See* A. Salley, The Boundary Line between North Carolina and South Carolina 28-30, 31 (Bull. no. 10, Hist. Comm'n. of South Carolina 1929). Because of uncertainty as to the boundary, North Carolina grants of the period have been recognized as valid by South Carolina courts. *See Moore v. M'Clure,* 4 S. C. L. (2 Brev.) 139 (1807). A 1775 South Carolina Memorial of the Torbert Grant also evidences its validity in this State.

100 Acres Mecklenburgh on the S° side of Broad river above Richard Hughes including his improvement in the bent of the river and including a small Island in the river Beginning at a Sowerwood tree on the river Bank about a hundred po: above the bent and runs S° 20 E + 200 po: to a large pine in the fork of a small branch thence down the Branch N° 70 + 100 po: to an ash on the river then up the river as it meanders to the Beginning.

The Torbert Grant is the focus of this case.

In 1798 Samuel Torbert died testate, devising a life estate in the property to his wife, Susanah Torbert, with a fee simple in remainder to his son, Samuel Torbert, Jr. The next recorded reference to the property appears in 1826 when the sheriff of Union District levied on it pursuant to a judgment against one Zachariah Reid. The public records do not show how Reid obtained possession of the property. However, there is no evidence the parcel in question was regranted by the State during the period from 1798 to 1826. From 1826 to 1973 the chain of title is perfect and unbroken. In 1973 Sloan purchased the property from its then owner, James Hubert Gibson.

Sloan mines sand from the river along the property. The State, as sovereign, claims title to the riverbed where Sloan conducts its mining operations. To enforce its claim, the State brought this action. The case is significant because for the first time in South Carolina's history the question of title to the bed of a nontidal, navigable stream is in issue between the State and the owner of adjacent riparian land.

I.

The parties disagree on the question we must decide. The State frames the issue as whether title to the beds of all nontidal, navigable rivers in South Carolina is vested in the sovereign by the common law. It argues that we need not decide what lands were conveyed by the Torbert Grant in 1767 because Sloan has not connected its title to that grant.

Sloan, on the other hand, suggests we need not decide whether the common law gives the State title to the beds of all nontidal, navigable rivers in South Carolina. It argues that the gap in its chain of title is irrelevant. The dispositive issue, in Sloan's view, is what property was conveyed by the

Crown to Samuel Torbert in 1767. If the sovereign divested itself of title to the riverbed in 1767, Sloan argues, the State cannot claim ownership of the land unless it proves a later source of title by purchase or escheat.

On either view of the case, a key issue is whether Sloan must prove a complete chain of title back to the Torbert Grant. We therefore address that issue first.

## II.

The State admits King George III conveyed the upland bordering the Broad River to Torbert in 1767. It also admits Sloan holds title to that same land today. Having admitted it divested itself, as sovereign, of title in 1767, the State cannot rely on alleged defects in Sloan's chain of title to regain ownership of what was granted. Like any other litigant, the State must recover on the strength of its own title, not the weakness of the defendant's. *State of South Carolina v. Evans*, 33 S. C. 184, 11 S. E. 697 (1890); *State v. Pacific Guano Co.*, 22 S. C. 50 (1884).

This principle clearly applies to the grant of the upland. There is no reason it should not also apply to a grant of the riverbed. If Sloan can show the riverbed was granted to Torbert in 1767, then the State, as the plaintiff asserting title, must prove by positive evidence that it regained title in some manner at a subsequent time. Having once divested itself of title to the riverbed, the sovereign cannot rely on a break in the record chain of private titles to establish its ownership. The question of whether the riverbed was conveyed by the Torbert Grant is thus the critical question to be answered.

The State argues that even if the bed of the river was conveyed by the Torbert Grant, Sloan must prove an unbroken chain of title from Torbert to itself in order to defeat the State's claim of ownership. In support of this novel proposition, it cites *State v. Yelsen Land Co.*, 265 S. C. 78, 216 S. E. (2d) 876 (1975).

We find no indication in *Yelsen Land* that the Supreme Court was overruling *State v. Evans*, *supra*, by requiring a private owner to prove a perfect and unbroken chain of title to a sovereign grant. *Evans* was neither cited by the parties nor mentioned by the Court in *Yelsen Land*. The language of

the decision relied on by the State simply refers to the claimant's inability in that case to "connect its title to a grant from the State." 265 S. C. at 81, 216 S. E. (2d) at 879. We read this statement as meaning the private owner failed to show a sovereign grant of the tidelands in question. Any other interpretation would require us to assume the Supreme Court intended to make a drastic change in the settled rules of common law without comment or explanation. If the "perfect chain of title" argument were accepted, few private titles would be secure against the State, since all real property in South Carolina was originally vested in the sovereign as the common source of title. *See State v. Pacific Guano Co., supra; Trustees of the University of South Carolina v. City of Columbia*, 108 S. C. 244, 93 S. E. 934 (1917).

### III.

The remaining issue is whether the Torbert Grant conveyed title to the center of the river in 1767.

Grants of land by a former sovereign are construed according to the law in force at the time of the grant. *Florida Gravel Co. v. Capital City Sand & Gravel Co.*, 170 Ga. 855, 154 S. E. 255 (1930); *Lewis v. City of Utica*, 159 A. D. 160, 145 N. Y. S. 346 (1913). In 1712 the General Assembly enacted a reception statute expressly declaring the common law of England to be the law of South Carolina:

> ... all and every part of the Common Law of England, where the same is not ... inconsistent with the particular constitutions, customs and laws of this Province, ... is hereby made and declared to be in as full force and virtue within this Province, as the same is or ought to be within the said Kingdom of England ....

2 Stat. at Large of South Carolina 401, 413-414 (Cooper ed. 1837). Thus, in 1767 the Torbert Grant would be governed by the English common law rule, unless that rule had been altered by statute or custom in South Carolina.

The State concedes that the English common law gave title to the bed of tidal streams to the sovereign and title to the bed of nontidal, fresh water streams to the owners of the adjacent riparian land, the owner on each side taking to the center of the stream. Accordingly, grants of land bounded by

rivers above tidewater vested title in the grantee to the thread of the stream, unless the terms of the grant clearly reserved the riverbed in the grantor. *See Fulton Light, Heat & Power Co. v. State,* 200 N. Y. 400, 94 N. E. 199 (1911); J. Angell, *A Treatise on the Common Law Relating to Watercourses* 11 (4th ed. Boston 1850) (1st ed. Boston 1824); M. Hale, *De Jure Maris,* c. i, at 5; 3 J. Kent, *Commentaries* *427; *see also Canal Comm'rs. v. People,* 5 Wend. 423, 443 (N. Y. 1830) (per Walworth, Chancellor). Under this rule, the Torbert Grant would have conveyed title to the center of the Broad River.

However, the State argues the English rule was not the law of South Carolina in 1767. It claims no colonial South Carolina case decided that riparian grantees own to the center of the river. It further asserts the English rule would not have applied by virtue of the 1712 reception statute, because the rule was inconsistent with conditions in this country. Finally, it argues that later North Carolina cases demonstrate the English rule did not apply to prerevolutionary grants in the Carolinas. We find these arguments unpersuasive.

The mere absence of decisional law in colonial South Carolina does little to advance the State's position. On the contrary, the English common law ordinarily is presumed to govern if there is no South Carolina authority to the contrary. *Cf. O'Hagan v. Fraternal Aid Union,* 144 S. C. 84, 141 S. E. 893 (1928). This does not mean our courts are bound by every decision made by the courts of England; but it does suggest the reasons must be very strong for departing from the English common law if there is no South Carolina authority on a particular point. *See Shecut v. McDowell,* 6 S. C. L. (1 Tread.) 35 (1812). Since no authority prior to 1767 questioned the applicability of the English rule in South Carolina, that rule is presumed to have been the law of the province until shown otherwise.

The State also argues that the English rule was inconsistent with conditions and customs in colonial South Carolina; yet it offered no proof of any local custom recognizing sovereign rights to the beds of nontidal streams. Counsel was unable to cite any instance in which the Crown asserted title to such riverbeds either in South Carolina or any other North American colony. Our research has discovered none. The

record is also devoid of evidence that a rule of private ownership would have interfered with local customs relating to the public use of nontidal, navigable rivers. Indeed, nineteenth century South Carolina cases strongly suggest that private ownership of nontidal rivers was the accepted condition in South Carolina. *See e.g., McCullough v. Wall,* 38 S. C. L. (4 Rich.) 68 (1850) (grants of land bounded on rivers above tide water carry exclusive title of the grantee to center of the stream); *Shands v. Triplet,* 26 S. C. Eq. (5 Rich. Eq.) 76 (1852) (*prima facie* the proprietor of each bank of a stream is the proprietor of half the land covered by stream; it would be inexpedient even for legislature to divest proprietors of land bounding on rivers above tide water of rights to soil covered by river).

Finally, the State argues that when prerevolutionary grants were before the courts of North Carolina in the nineteenth century, those courts did not apply the English common law rule. In particular, the State cites *Wilson v. Forbes,* 13 N. C. (2 Dev.) 30 (1828), and *Collins v. Benbury,* 25 N. C. (3 Ired.) 277 (1842), *on rehearing,* 27 N. C. (5 Ired.) 118, 14 Am. Dec. 155 (1844), which held grants of land bounded by navigable waters convey ownership of the soil only to the water's edge. Those cases are distinguishable, however, because they were decided under North Carolina statutes which altered the English rule. South Carolina has no comparable statutes. Therefore, the North Carolina authorities are of little relevance in determining the law of this State.

In essence, the State's arguments for restricting the Torbert Grant are based on its notions of wise public policy rather than the application of common law doctrine. This Court cannot, in the pursuit of what we may consider desirable policy goals, destroy rights of property vested in Sloan by the common law. We hold that under the common law as it existed in South Carolina in 1767 the Torbert Grant conveyed ownership of the soil to the center of the Broad River. Since there is no evidence the State reacquired title to the riverbed at any time after the Torbert Grant, its claim of present ownership must fail. We do not suggest the riparian owner's rights to the bed of a navigable river are absolute or that the owner's use of his property is not subject to lawful regulation by appropriate public au-

thority. However, we find no merit to the State's claim that it owns the river bed by virtue of the common law.

The judgment of the circuit court is

Affirmed.

SANDERS, C. J., and SHAW, J., concur.

## ON PETITION FOR REHEARING

BELL, Judge:

The State petitions for rehearing on the ground, *inter alia*, that the Court overlooked or misapprehended the facts in *State v. Yelsen Land Co.*, 265 S. C. 78, 216 S. E. (2d) 876 (1975). The State argues that numerous South Carolina cases,[1] including *Yelsen*, have adopted a "perfect chain of title" rule under which a private owner can assert title against the State only if he proves an unbroken chain of conveyances from a sovereign grant to his own deed. The State claims this rule is derived from the principle that "one not in possession must ... show a perfect chain of title." We have carefully considered the State's argument and find no merit in it.

*State v. Yelsen Land Co.*, *supra*, is readily distinguishable from this case, because the original deed in the private claimant's chain of title did not convey the tidelands in dispute. In *Yelsen*, the Court correctly held:

> The boundaries given ... did not convey title to low water mark, and the foregoing deed, therefore, did not convey title to tidelands.

265 S. C. at 82, 216 S. E. (2d) at 879. In this case, the original grant and all succeeding conveyances did convey title to the thread of the stream. The State's argument simply ignores the different common law rules for construing riparian

[1] The State invites our attention to the cases collected under 14 S. C. Digest, Navigable Waters, Key No. 37(4). Without exception, those cases deal with construction of grants of land abutting on tidal waters. They stand generally for the rule that a grant of lands bounded by tidal waters conveys only to the high water mark, unless there is specific language granting below high water mark. *See, e.g., State v. Fain*, 273 S. C. 748, 259 S. E. (2d) 606 (1979). At common law, this same rule of construction did not apply where the lands granted were bounded by nontidal waters. *See McCullough v. Wall*, 38 S. C. L. (4 Rich.) 68 (1850).

grants along tidal and nontidal waters. *Cf. Cape Romain Land & Improvement Co. v. Georgia-Carolina Canning Co.*, 148 S. C. 428, 146 S. E. 434 (1928).

The failure of the private claimant in *Yelsen* to connect its title to an original sovereign grant was significant for a reason other than that argued by the State. The claimant failed to show the tidelands in issue had ever been granted by a conveyance in its chain of title. It, therefore, attempted to support its claim of ownership by reference to a sovereign grant which it conceded was not in its chain of title. It is not clear from the record in *Yelsen* that the earlier sovereign grant upon which the private claimant relied (i.e., the grant from the State to John M. Maillard dated August 3, 1818) covered the same property as the deed in the claimant's chain of title (i.e., the deed to G. W. McCormick dated February 6, 1984). Assuming, however, that the same property was covered by both conveyances and also assuming the sovereign grant conveyed lands below the high water mark (a question not decided by the Court), the claimant was still faced with the difficulty that the original deed in its chain of title did not convey the tidelands. Thus, it was irrelevant what might have been conveyed to another grantee by an earlier sovereign grant. This fact, not the State's "perfect chain of title" argument, explains the Court's conclusion that the private claimant's failure to connect up to the sovereign grant defeated its claim.

The State's additional argument that one *not* in possession must show a perfect chain of title, overlooks the fact that Sloan is the party in possession in this case. It is well settled that where one enters land under a claim of title, possession of any part within the boundaries set out in the title is possession of the whole tract covered by the title. *See Littleton v. Roberts*, 181 S. C. 303, 187 S. E. 349 (1936); *Anderson v. Darby*, 10 S. C. L. (1 Nott & McC.) 369 (1818); *Brandon v. Grimke*, 10 S. C. L. (1 Nott & McC.) 356 (1818); *Eifert v. Read*, 10 S. C. L. (1 Nott & McC.) 374 (1816). Since Sloan's deed conveyed to the middle of the river, Sloan's entry on the land placed it in possession of the riverbed as a matter of law. Moreover, Sloan has physically occupied the riverbed by mining sand from it. The rule that the State comes into court with a presumption of title, which

is the correct rule when lands have never been granted by the sovereign, does not apply when lands have once been granted, as they were in this case. *See State v. Hardee*, 259 S. C. 535, 545, 193 S. E. (2d) 497, 502 (1972) (Bussey, J., concurring). We are, therefore, at a loss to understand the State's assumption that Sloan is the party out of possession.

We have considered the additional grounds for rehearing in the State's petition and find them also to be without merit. Accordingly, the petition for rehearing is denied.

Petition for rehearing denied.

SANDERS, C. J., and SHAW, J., concur.