## FRAMPTON v. WHEAT.

1. Where a statute declares terms upon which vacant lands of the State may be granted, the courts cannot limit this provision to lands recently acquired from the Indians in one section of the State.

2. In action between private parties claiming a tract of land, a grant of State lands under the seal of the State and signed by her proper officers, cannot be held void for failure to comply with the conditions prescribed by statute to her officers in making grants, where it does not clearly appear that the conditions were present and that the officers disregarded them.

3. A statute prescribed that in granting vacant lands on navigable streams the grant should not include exceeding one chain on the river front for every four chains back. For this statute to defeat a grant, the party assailing the grant must show that the land was not so located, and that there was back vacant land enough to make a compliance possible; but where the grant is perfectly fair on its face, such testimony is inadmissible for the purpose of annulling it.

Before WALLACE, J., Charleston, March, 1886.

The opinion fully states the case.

*Messrs. H. E. Young* and *W. J. Whaley*, for appellant.

*Messrs. G. W. Dingle* and *Lord & Hyde*, contra.

October 6, 1887. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. This was an action to recover "200 acres of marsh land, lying adjacent to and around Plum Island, in the parish of St. Andrews, and bounded on the north by the marsh lands of W. W. McLeod, east on Ashley River, south by New Town or James Island Creek, and west by other lands of the plaintiff." The plaintiff alleged that in 1882 the defendant

wrongfully entered said premises, and put up notices thereon, and damaged plaintiff thereby to the extent of $250. The defendant answered, denying that the plaintiff is the owner of the land described ; but, on the contrary, claiming that she is "the owner in fee and fully possessed of all that tract of land known as Plum Island, lying westward of the mouth of New Town Creek and southward of Ashley River; containing six acres of high land and two hundred acres of marsh land, embracing the marsh land adjacent to and around Plum Island," &c.

The cause was heard before Judge Kershaw and a jury. The plaintiff introduced the following chain of title : In 1828, grant of the State to William McK. Parker for 779 acres of marsh land (covering the marsh land in dispute), situate on Ashley River, New Town Creek, and Wappoo Creek (plat attached). In 1830, William McK. Parker, the grantee, died, leaving his real property to his wife, Anna S. Parker, for life, and after her death to her children. Widow Anna S., executrix, applied to the court to sell the lands for payment of debts, and, under the sale, commissioner Gray conveyed to Sarah P. Parker 769½ acres of high land and 779 acres of marsh, bounded north on Wappoo Creek, &c. In 1847 Sarah P. Parker devised her plantation to her two grandsons, William McK. Parker and Edward L. Parker. In 1851 William McK. Parker and Edward L. Parker conveyed to W. W. McLeod 914½ acres of high land and 779 marsh on James Island. In 1879 the heirs of W. W. McLeod had partition of his estate, and there was allotted to Anna M., one of the children, "178 acres of high land and — acres of marsh land adjacent thereto along the Ashley River and James Island cut, bounded north on tract allotted to W. W. McLeod, east on Ashley River and James Island cut, south on James Island cut and land of Regina L. McLeod," &c.

The plaintiff also offered evidence tending to show that W. W. McLeod purchased and owned the "Parker place" on James Island, and was in possession of the same, high land and marsh land, until he went into the Confederate army and died about the close of the war; that for a short time the "Freedmen's Bureau" had possession of it, but in 1866, his executor, William M. Lawton, recovered possession ; that in 1869, Anna M. mar-

ried James Frampton, and in 1879, the partition of the estate took place, and that the marsh land in question was within the portion assigned to the plaintiff, Mrs. Frampton, and that Frampton and wife have since that time rented the right to cut marsh upon it until 1882, when Mrs. Wheat, through her husband, ran off the laborers who were cutting marsh, and claimed the land as her own by posting up written notices, warning parties from cutting marsh or trespassing thereon, &c.

The defendant offered no evidence, but upon the close of the plaintiff's, moved for a non-suit, which was granted, the judge saying: "I must hold under the act of the legislature, making it incumbent upon the surveyor general to lay off four chains back for every chain on the river or stream · front, that this grant is void, the requirements of the act not being done in this case. It is a familiar doctrine that prescription cannot run against the State in favor of a right which the State had no right to grant. Prescription is presumption of a grant. If the State has no power to make the grant, then no matter how long the possession may be, you cannot presume that done which the law says cannot be done. So I do not see how the plaintiff here could hold under the twenty years' possession, even if it had been made out. I am constrained to grant the non-suit."

From this order the plaintiff appeals to this court upon the grounds of error: "I. Because his honor erred in non-suiting plaintiff on the evidence submitted. II. Because his honor erred in holding that the grant put in evidence by plaintiff, and covering the land in dispute, was void upon its face. III. Because his honor erred in assuming that the State could not make this grant, and concluding from this that plaintiff could not acquire title by prescription to the land in dispute," &c.

There was no survey or plat of the marsh land in dispute, and therefore its precise location did not appear. It was admitted, however, that it was embraced in the grant to William McK. Parker of 1828, with its very meagre plat attached. The Circuit Judge granted the non-suit on the ground that this grant was void, and therefore the only queston before this court is, whether in doing so he committed error of law. Our opinion is confined to that point and that alone.

In 1784, soon after the State became independent by the treaty of Paris (1783), and while there was still much vacant land within her borders, the legislature passed an act "for establishing the mode and conditions of surveying and granting the vacant lands within this State" (4 *Stat.*, 592), the 12th section of which was in these words: "That on all creeks and rivers navigable for shipping or boats, whereon any vacant lands shall lie, the deputy surveyors shall, and they are hereby directed to, lay off the same by measuring four chains back from such river and creek for every one fronting on and bounded by the same; and all surveys not made and regulated by this rule, and any grant which may be obtained thereon, are hereby declared to be null and void to all intents and purposes," &c. In March, 1785, and again in October of the same year, this act was amended in certain particulars, not, however, touching the matter of the section above quoted. In 1791, another original act was passed, "for establishing the mode of granting the lands now vacant in this State, and for allowing a commutation to be received for some lands that have been granted." 5 *Stat.*, 168. The preamble of this act declared that "whereas all the valuable lands in this State have already been granted," &c., and it then made certain provisions reducing the cost of taking out grants, &c., but made no reference to the aforesaid 12th section of the previous act of 1784.

The grant of 1828, here in question, was issued expressly and in terms under this act of 1791, which made no reference to the section aforesaid. We have not been referred to any authority that the 12th section of the act of 1784 was ever expressly repealed until the adoption of the general statutes in 1872, when the whole act was so repealed, and is no longer the law of the State. Nor have we been referred to a single case during the hundred years since its passage in which the point now before the court was made and judicial construction given to the section. From these circumstances, and its unusual and peculiar provisions, the suggestion was made that the section must in some way have been repealed, or at least have become obsolete from non-user. But whilst we think it probable that it fell into disuse and was disregarded, after most of the valuable lands of the State had been granted, nothing has appeared showing that it was not

in active operation in 1828, when the grant in question was issued. It was also argued from the history of those early times, and the condition as to vacant lands of the new sovereign State, that the aforesaid section was never intended to apply to the old settled seaboard portion, but to lands in the upper part of the State, then recently acquired from the Cherokee Indians. But the court could not venture so to alter and limit the general terms of the provision.

In the view, however, that the section had not been repealed or become obsolete in 1828, and applied to a grant of marsh land, we cannot think that the defendant had the right to have this grant declared void. The grant was regular in form, under the broad seal of the State, and successive parties had held under it such possession as the character of the property permitted, for nearly sixty years without notice of any alleged defect in it. It must be kept in mind that this is not a proceeding in the Court of Caveats or elsewhere to have the grant revoked upon the ground that it was improvidently or illegally issued by the land office. But the question arises in a private suit between parties claiming the land. It does not clearly appear what title the defendant sets up, but it does appear that the plaintiff and those under whom she claims have held under it as *bona fide* purchasers for valuable consideration for at least half a century; and it is not quite certain that she could not raise the question whether, under these circumstances, the solemn act of the State in issuing the grant could be thus collaterally assailed. See *Polk's Lessee* v. *Wendell*, 5 *Wheat.*, 293, and cases referred to.

But it seems that there are cases even between private persons in which a grant may be assailed, as being upon its face absolutely void as to all the world; as, for instance, where the State has no title to the thing granted, or where the officer has no authority to issue the grant, &c. In such cases the validity of the grant is necessarily examinable at law. We do not think that this grant was absolutely void upon its face; but as the scope of the defendant's objection seems so to regard it, we will consider the question. There is no pretence here that the State did not have title to the thing granted, as it did not in the case of *Patterson* v. *Jenks* (2 *Peters*, 227), where the State of Georgia

had issued a grant upon a survey of land, part of which lay
beyond the Georgia State line, and upon the Indian hunting
grounds. It was there held that. the grant was void *quoad* the
lands which lay beyond the State line, and as to which the State
had no right to issue a grant. Nor can it be said here that the
State had no right to issue the grant, for the reason that the land
was marsh. See *The State* v. *Pacific Guano Company*, and the
case of *The Oak Point Mine*, in the appendix, 22 *S. C.*, 50, 593.
Nor can it be claimed that the officer, Governor John Taylor, had
no authority to issue the grant. The premises were grantable,
the grant was by the proper officer and in due form; and we see
nothing· on its face to authorize the court, in a collateral pro-
ceeding, to declare it void.

It is urged, however, for the defendant, that the grant was
made void, not by anything upon its face, but by a fact prior to
its issue in point of time, and lying behind it—that it was an
indispensable prerequisite that the survey on which it issued
should have been made in accordance with the section so often
referred to, which was not done; that the deputy surveyor did
not "measure four chains back from the river for every one front-
.ing on the same." How was this alleged fact made to appear ?
The court requires clear and strong proof to justify it in setting
aside an act of the State authorities, especially where property is
held under it on the faith reposed in the State. The defendant
offered no evidence, and therefore there was no proof upon the
subject, unless the vague plat attached to the grant furnished it.
We do not think that was sufficient to rebut the presumption that
the officers·did their duty. To make out the allegation so as to
overthrow the grant, it seems to us that it was necessary to prove
affirmatively at least two things: first, that the surveyor did not
locate the land as required by the section aforesaid ; and second,
that there was sufficient vacant lands adjacent to the survey to
make practicable a compliance with the provision which mani-
festly contemplated vacant lands sufficient for that purpose, lying
back of the survey. Unless there was such vacant land back of
this survey, we think it was not a case for the application of the
rule of the section ; otherwise there might be an isolated piece of
vacant land lying on a stream which could never be .located or

granted; and we suppose that such could not have been the intention of any part of an act, the preamble of which declared that "the granting of the vacant lands of this State will be greatly conducive to its strength and prosperity, by increasing the agriculture and population thereof."

But the grant being perfectly fair upon its face, would the testimony indicated above have been admissible for the purpose of annulling it? As to all acts necessary to be done prior to the grant and leading up to it, we must assume that all the officers did their duty. The authorities and good policy concur in the doctrine "that the court will not question the validity of a grant which appears regular and legal on its face." *Mounce* v. *Ingram*, 1 *Brev.*, 66; *Trapier* v. *Wilson*, 2 *McCord*, 191; *Huggins* v. *Brewer*, 2 *Bail.*, 26; *Polk's Lessee* v. *Wendell*, *supra*; *Patterson* v. *Jenks*, 2 *Peters*, 227. In the case of Polk's Lessee, Judge Johnson, of the Supreme Court, said: "Long experience had satisfied the mind of every member of the court of the glaring impolicy of our admitting an inquiry beyond the dates of the grants under which lands are claimed," &c. And in the case of *Patterson* v. *Jenks*, *supra*, Chief Justice Marshall said: "Undoubtedly the presumption is in favor of the validity of every grant issued in the forms prescribed by law; and it is incumbent on him who controverts it to support his objections. The whole burden of proof lies on him; but if his objections depend on facts, those facts must be submitted to the jury. If opposing testimony be produced, that testimony also must be laid before the jury; and the court may declare the law on the facts, but cannot declare it on the testimony. * * * In the case of *Polk's Lessee* v. *Wendell* (9 *Cranch.*, 87; 5 *Wheat.*, 293), this court decided that a grant raises a presumption that every prerequisite has been performed; consequently that no negligence or omission of the officers of government anterior to its emanation can affect it," &c.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and that the cause be remanded to the Circuit Court for a new trial.