19516

The STATE of South Carolina, Respondent, v. Claire D. HARDEE, Appellant

(193 S. E. (2d) 497)

*Cecil W. Schneider, Esq.,* of Georgetown, *for Appellant,*

*Messrs. Daniel R. McLeod, Atty. Gen.,* and *Edward B. Latimer, Asst. Atty. Gen.,* of Columbia, *for Respondent*

*Messrs. Buist, Moore, Smythe & McGee,* of Charleston, *Amicus Curiae,*

November 14, 1972.

Moss, Chief Justice:

The State of South Carolina, the respondent herein, in its complaint in this action alleges the ownership of all tidelands in South Carolina, this being the area between the usual high water mark and the usual low water mark, and the usual low water mark, and the submerged land, this being the area below the usual low water mark. It further alleges that it holds title thereto in trust for the people of the State.

It appears from the record that Claire D. Hardee, the appellant herein, obtained a deed from Carrie L. Lindler, dated August 6, 1964, purporting to convey to her lots 48, 49 and 54 as shown on a plat by J. L. Bull, Jr., dated July 28, 1938 and further shown on a plat, dated March 16, 1967, prepared by Legare Hamilton. Said lots being on Pawleys Island in Georgetown County. As it appears from said plats, these lots are bounded on the northwest by Salt Creek and on the southeast by Myrtle Avenue and on the northwest and southwest by other lots in the subdivision. This action involves the ownership of a certain strip of tidelands extending from Pawleys Island toward the mainland which is a portion of the aforesaid lots.

The respondent instituted this action against the appellant to restrain and enjoin her or anyone acting for her and in her stead, trespassing upon, filling, constructing or otherwise changing the natural state of so much of said lots as constitute tidelands. The appellant, in her answer, denied the material allegations of the complaint and alleged her ownership of the lots in question down to the usual low water mark along Salt Creek on said Pawleys Island.

The record reveals that by deed dated April 4, 1842, the State of South Carolina conveyed to Col. Peter W. Frazier:

"A plantation or tract of land, containing three hundred sixty-six acres (surveyed the 25th January 1942). Situate in Georgetown District on Pawleys Island, waters of the Atlantic Ocean bounding North by an Inlet East by the Ocean South by Col. T. P. Alston, West by a Creek, Having such shape, form and marks as are represented by a plat hereunto annexed, . . . "

Attached to said deed is a plat made pursuant to a warrant, dated January 22, 1842, from S. R. Hucks, Commissioner of Locations for Georgetown District. Endorsed upon said plat is a certificate by Benjamin Johnson reading as follows:

"I have laid out to Col. Peter W. Frazier, a tract of land containing three hundred sixty-six, (366) acres, situated in

said District on Pawleys Island Waters of the Atlantic Ocean, Bounding North East by an Inlet, East by the Ocean, South by Col. T. P. Alston, West by a Creek, Having such shape, forms and marks as are represented, The Island has been originally granted to Joseph Allen, but this survey is for the purpose of obtaining a new grant."

It is admitted that Col. Peter W. Frazier was the predecessor in title to the appellant and whatever interest she may have in the area between the usual high water mark and the usual low water mark depends upon an interpretation or construction of the grant to him by the State of South Carolina. The issue here is whether under the language of the said grant by the State of South Carolina to Col. Peter W. Frazier the appellant owns the land to the usual low water mark.

This case came on for trial at the 1971 April Term of the Court of Common Pleas for Georgetown County. The trial judge submitted to the jury, as a question of fact, the location of the usual high water mark of the area in controversy. The jury determined that the usual high water mark of lot 54 was one hundred fifty four (154) feet from the right of way of Myrtle Avenue. There was no appeal from this finding. The parties agreed that the usual high water mark of lots 48 and 49 was at the right of way of Myrtle Avenue. The court took under advisement, as a question of law, the interpretation or construction of the grant by the State of South Carolina to Colonel Peter W. Frazier.

The trial judge found and concluded that Salt Creek is a navigable stream. There was no appeal from this finding of fact. He also found, in interpreting the grant by the State of South Carolina to Colonel Peter W. Frazier and the annexed plat, that the appellant had failed to prove title to the land between the usual high water mark and the usual low water mark. He also concluded, assuming the appellant proved title to the land described in the grant, it did not follow that the title was proved to "the low water

mark." The trial judge found that the lands lying below the usual high water mark on the said plat of lots 48, 49, and 54 are owned by the State of South Carolina.

The appellant prosecutes the appeal to this Court alleging error on the part of the trial judge in finding that she had failed to prove title to the land between the usual high water mark and the usual low water mark, the error being that under the language of the grant to Colonel Peter W. Frazier in 1842 the appellant owns the land to the usual low water mark.

We have held that in determining the extent of the ██ boundary of a body of land, the same rule does not apply to tidal navigable streams, such as the one in question, that applies to a nonnavigable stream. When a body of land is bounded by a nonnavigable stream, the general rule is that the boundary line is the middle of the stream, whereas, in the case of a tidal navigable stream the boundary line is the high water mark, in the absence of more specific language showing that it was intended to go below high water mark, and the portion between high and low water mark remains in the State in trust for the benefit of the public. *State v. Pacific Guano Co.,* 22 S. C. 50; and *Cape Romain Land & Imp. Co. v. Georgia-Carolina Can. Company,* 148 S. C. 428, 146 S. E. 434.

A deed or grant by the State of South Carolina is ██ construed strictly in favor of the State and general public and against the grantee. In support of this rule attention is directed to *State v. Pacific Guano Co.,* 22 S. C. 50, where it is said:

* * * "In all grants from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor, reversing the rule as between individuals, on the ground that the grant is supposed to be made at the solicitation of the grantee, and the form and terms of the particular instrument of grant proposed by him and submitted to the government for its al-

lowance. But this rule applies *a fortiori* to a case where such grant by a government to individual proprietors is claimed to be not merely a conveyance of title to land, but also a portion of that public domain which the government held in a fiduciary relation, for general and public use. " * * *

The respondent comes into court with a presumption of title and if the appellant is to prevail she would have to recover upon the strength of her own title of which she must make proof. *State v. Pinckney*, 22 S. C. 484.

In *State v. Pacific Guano Co.*, 22 S. C. 50, this Court held that a grant by the State of the lands on the shore of a navigable tidal channel gives title only to the high water mark. In *State v. Pinckney*, 22 S. C. 484, this Court held that a deed that calls for boundaries on tidal navigable streams conveys the land down to the ordinary high water line only. In the cited case the common law rule was thus stated : "if the boundary be a navigable stream, that is, one in which the tide ebbs and flows, the land extends only to the water's edge, or to high water mark." We quote further from the cited case the following :

"So a conveyance bounding 'westerly by the beach,' excludes the shore or land between low and high water mark. The same is the rule where the land is bounded by the sea, or an arm of the sea. The space between high and low water mark of the border of the sea is called the 'shore,' and belongs by the common law to the sovereign, precluding, of course, the claim of any other person, unless acquired by grant from the sovereign. The state, in such cases, holds the fee in trust for the public," &c.

In the case of *Shivley v. Bowlby*, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331, the United States Supreme Court said :

"In South Carolina, the rules of the common law, by which the title in the land under tide waters is in the state, and a grant of land bounded by such waters passes no title below

high-water mark, appear to be still in force. *State v. Pacific Guano Co.*, 22 S. C. 50; *State v. Pinckney,* 22 S. C. 484."

This Court, in the case of *Cape Romain Land and Improvement Co. v. Georgia-Carolina Canning Co.,* 148 S. C. 428, 146 S. E. 434, stated that:

* * * "The title to land below high-water mark on tidal navigable streams, under the well-settled rule, is in the state, not for the purpose of sale,. but to be held in trust for public purposes."

The foregoing quote from the *Cape Romain* case has been criticized as being *dicta* only and should not be read to prevent private persons from obtaining title to tidelands. The State, through its attorney general, has consistently expressed the view that the statement is a part of the holding of the case and precludes sale of tidelands except by an act of the legislature.

In an interesting article on the subject "The Law Pertaining to Estuarine Lands in South Carolina", written by William A. Clineburg and John E. Krahmer, Professors of Law at the University of South Carolina Law School, reported in Volume 23, No. 1, at Page 7 of the South Carolina Law Review, they state:

"In the opinion of the authors of this report, neither view represents an entirely accurate reading of *Cape Romain.* The writers believe that a careful examination of the case leads to the conclusion that the actual and necessary holding of *Cape Romain* is that tidelands are owned by the State in trust for the people,, and that any grant which purports to convey such land will be very strictly construed; but this is not to say that such lands can never be sold as might be indicated by the language quoted above, but rather that the ability to sell and the method of sale remain open questions under *Cape Romain.*

"It is also the opinion of the present writers that the holding of *Cape Romain* is fully in accord with the early

case of *Pacific Guano and* that *Cape Romain* is quite consistent with that earlier opinion.

"To contend, therefore, that *Cape Romain* overturned prior legal principles and introduced uncertainty into the law is a point not well-taken. Indeed, if anything, the case reaffirmed long-standing rules of the common law."

The view expressed in the *Cape Romain* case is supported by what this Court said in *Rice Hope Plantation v. S. C. Pub. Ser. Auth.,* 216 S. C. 500, 59 S. E. (2d) 132, as follows:

"The briefs on both sides in the case before us contain much discussion on the subject of ownership of the land lying between normal high water mark and low water mark on tidal navigable streams, and as to the acquisition of title thereto by private owners. We adhere to our opinion in the case of *Cape Romain Land & Improvement Co. v. Georgia-Carolina Canning Co.,* 148 S. C. 428, 146 S. E. 434, 438, *supra,* wherein it was said: 'The title to land below high-water mark on tidal navigable streams, under the well-settled rule, is in the state, not for the purpose of sale, but to be held in trust for public purposes.' But we do not deem it necessary or proper upon this appeal to determine under what circumstances and by what method, if any, title might be acquired by private owners, because any such ownership would be, in our opinion, subject to the dominant power of the government (State and Federal) to control and regulate navigable waters."

We adhere to the rule announced in the *Cape Romain* case and as reaffirmed in the *Rice Hope Plantation* case.

The appellant, in her brief, concedes that under the rule announced in the *Pacific Guano* and *Cape Romain* cases the mere naming of a navigable stream as a boundary would carry title only to the high water mark. The appellant admits, "If that were all the evidence there is, the line would stop at the high water mark."

The deed or grant of the State of South Carolina to Colonel Peter W. Frazier states the lands described therein is bounded "west by a Creek." Admittedly, the Creek referred to is Salt Creek. The plat annexed to the deed shows that the west or northwestern boundary is a Creek (Salt). There is nothing on the deed or the plat that gives the low water mark of Salt Creek as the boundary.

■ In the absence of specific language, either in the deed or on the plat, showing that it was intended to go below high water mark, the portion of the land between high and low water mark remains in the State in trust for the benefit of the public. The burden was upon the appellant to prove her title to the land to the low water mark on Salt Creek. She has failed so to do and, therefore, cannot prevail.

We concede that the trial judge was correct in holding that the appellant acquired title to the high water mark only and that the land lying below the usual high water mark on the plat of lots 48, 49 and 54 are owned by the respondent.

The exception of the appellant is over-ruled and the judgment below is,

Affirmed.

LEWIS and LITTLEJOHN, JJ., concur.

BUSSEY and BRAILSFORD, JJ., concur in result.

BUSSEY, Justice (concurring in result) :

This appeal presents for decision only a single, narrow question. Appellant's sole contention is that "under the language" of the Frazier grant her title extends to the usual low water mark of Salt Creek. The majority opinion holds that she has failed to prove her "title to the land to the low water mark on Salt Creek", which is dispositive of her appeal and to this limited extent I agree with the majority opinion.

There is nothing in the record to show precisely where the lots of the appellant are located with reference to the

plat attached to and made a part of the Frazier grant. She has offered nothing in proof of her claim, save the Frazier grant and plat. With one minor exception, no courses or distances are shown on said plat. The depicted tract is a somewhat elongated one and the creek shown thereon as the western boundary runs a rather meandering course approximately parallel to the beach or ocean front on the eastern side of the island. No express mention of either high or low water mark is made or indicated on the plat. The word "marsh" appears at one point within the perimeter of the platted area, and the markings on that immediate portion of the plat would seem to indicate that considerable marshland was included within the perimeter. There is nothing, however, to indicate just what portion of such marshland lay below usual high water mark.

Since appellant relies solely on the "language of the grant" to establish her title to the "usual low water mark", two established rules of construction govern the decision of her contention. 1. As a general rule, with certain exceptions recognized since prior to the days of Blackstone, and not here pertinent, the terms of a sovereign grant are to be taken most strongly against the grantee and in favor of the grantor. 2. In the absence of anything to evince a contrary intention, a grant by the State to land, giving a tidal, navigable stream as a boundary, passes no title to land below the usual high water mark. *State v. Pacific Guano Co.* (1884), 22 S. C. 50; *State v. Pinckney* (1884), 22 S. C. 484; *Shively v. Bowlby,* 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed.331 (1894); *Cape Romain Land & Imp. Co. v. Georgia-Carolina Can. Co.* (1928), 148 S. C. 428, 146 S. E. 434.

The foregoing rules of construction were somewhat ineptly and incompletely stated in the *Cape Romain* case. Of course, all rules of construction are subservient to the primary rule that the courts should endeavor to ascertain and give effect to the intention of the parties. As was said in *State v. Pinckney, supra:*

"We are aware that natural objects named as boundaries are entitled to much weight in questions of location, but at last the true criterion in such cases is the intention of the parties."

Applying the foregoing rules of construction to the instant situation, where only the language of the grant is relied upon, title of the appellant does not extend to low water mark in the absence of some language in the grant or accompanying plat, showing that the boundary was intended to be the "low water mark". She points to nothing in either the language of the grant or the content of the accompanying plat evincing any such specific intent.

The question of what, if any, marshland lying below usual high water mark was intended to be and/or was granted by the Frazier grant is not presently before the Court and could not be properly decided without the joinder of various other parties. The majority opinion, influenced no doubt by an inaccurate statement of the case, attributes to the respondent's complaint an allegation of ownership by the State of "all tidelands in South Carolina", whereas, the complaint actually asserts the claim of the State only to the tidelands comprising a portion of the three lots claimed by appellant. I would be careful to avoid any possible prejudice to the parties not before the Court and hold only that there is no merit in appellant's sole contention that her title to land extending to the "usual low water mark" is established by the language of the Frazier grant.

Aside from my principal objections to the majority opinion, I deal briefly with one statement therein which possibly justifies some comment. It is said, *inter alia,* that the State "comes into court with a presumption of title", which is the correct rule applicable to land which has never been granted by the sovereign, but which no longer applies when land has once been granted. *State v. Evans,* 33 S. C. 184, 11 S. E. 697. It is at least doubtful that the State is entitled to the presumption in this case since the legend on the Frazier

plat showed that the island depicted thereon had been previously granted to one Joseph Allen.

In my view, the majority opinion needlessly goes into controversial matters not necessary to a decision of the single, narrow issue before the Court, and thereby adds to the considerable confusion that has existed now for a half century with respect to the law of South Carolina as to tidelands. I have urged my colleagues, so far unsuccessfully, to either delete major portions of the opinion or, failing such, to clarify for the edification of the trial bench, the bar and the public generally, the meaning and intent of the majority.

If the experience of the ages should have taught us, as appellate jurists, any truly important lessons, possibly the most important one of all might well be that we should maintain a constant vigil to avoid wading in troubled and tumultuous waters when doing so is totally unnecessary to the decision of the cause before us. Personally, I venture into these troubled waters only because of my unsuccessful efforts to obtain either deletion or clarification, and in the hope that the observations hereinafter made may be of some help to the trial bench and the bar, and possibly even to this Court in the future in clarifying, and dissipating existing confusion as to, the law of tidelands in South Carolina.

Aside from the judicial restraint which we should voluntarily exercise, in the instant case we, upon petition, permitted the intervention and filing of an *amicus curiae* brief. The *amicus curiae* intervenor is a citizen of prominence, substance and high repute, he being represented by prominent and capable counsel, who, as the members of this Court well know, has made an extensive study of tidelands law in South Carolina. The *amicus curiae's* petition and brief urged this Court to restrict its decision to the single, narrow question raised by the appeal and to avoid deciding anything which might unnecessarily jeopardize the rights of the *amicus curiae* and various other persons similarly situated,

not now before this Court. Quite substantial reasons why the Court should so confine itself are set forth. In my view, the petition of the *amicus curiae* was most appropriate and no sound reason has been suggested for not complying with his request. The majority opinion, most unfortunately, I think, simply ignores the *amicus curiae* and his quite sound position.

Despite any divergent views as to the law appertaining to tidelands, I believe it is safe to say that all judges and lawyers, at all familiar therewith, will agree that certain language contained in the opinion in *Cape Romain*, and particularly the sentence repeated with approval in the *Rice Hope* case, has given rise to great controversy, and, in the humble opinion of this writer, to utter confusion. The majority opinion clearly recognizes the existence of great controversy, as evidenced, *inter alia*, by the quotation from the article by Professors Clineburg and Krahmer, in Volume 23, No. 1, at page 7 of the South Carolina Law view.[1] The opinion, however, goes on to simply restate and adhere to the language which gave rise to the controversy in the first instance, without at all intimating what the majority considers the meaning and effect thereof to be.

While there is other language in the *Cape Romain* opinion which contributed to the controversy and confusion, the most controversial is the following sentence:

"The title to land below high-water mark on tidal navigable streams, under the well-settled rule, is in the state, not for the purpose of sale, but to be held in trust for public purposes."

In my view, this sentence, like the earlier statement in *Cape Romain* that "the portion of land between high and

---

[1] Like the majority, I find this article interesting, probably for quite different reasons, but not at all authoritative or even persuasive. Much more comprehensive and in depth articles on the law appertaining to tidelands and submerged lands in South Carolina have been heretofore published in the South Carolina Law Review. Horlbeck, Titles to Marshlands in South Carolina, Part I, 14 SCLQ 288; Part II, 14 SCLQ 335; Logan and Williams, Tidelands in South Carolina: A Study in the Law of Real Property, 15 SCLR 657.

low water mark remains in the state in trust for the benefit of the public interest", was pure *dictum* likewise, its repetition in *Rice Hope* was pure *dictum,* as in that case no issue of title to tidelands was directly involved or decided by the Court. Circuit court decrees coming to the attention of the writer would indicate that most trial judges who have had occasion to consider such are substantially in accord with the writer's view of the controversial *Cape Romain* language. Most certainly in accord are most of the attorneys practicing in coastal South Carolina, who are students of and experienced in the law of tidelands. Obviously, however, my colleagues are convinced that this language has some sound meaning, else they would not repeat and adhere to it, but what meaning? Since the majority opinion leaves this question unanswered, I think it might be helpful to the bench and bar for me to here set forth what I understand my colleagues to concede that the language *does not mean.*

On its face, the controversial sentence seems to say, if it says anything really meaningful, that tidelands were not then and never had been subject to grant and private ownership. To the contrary, I undertsand my colleagues to concede that tidelands in this State are now and always have been the subject of lawful grant and private ownership. In this concession they are eminently correct, as any idea that the State lacked the power to convey tidelands to private persons or interests, both prior and subsequent to *Cape Romain,* is completely contrary to both law and history, as can be readily demonstrated by reference to judicial decisions and various acts of the General Assembly, any contentions to the contrary notwithstanding.

For anything like a proper understanding of the law appertaining to tidelands in South Carolina it is important to keep in mind the particular factual situation to which the language of the Court was immediately addressed. Lands underlying and also immediately adjacent to streams and other bodies of water, which are both tidal and navigable,

have been variously described, classified or categorized by writers and the terminology tends to become confusing to the casual reader or observer. For the purpose of the following remarks, however, I shall use the term "tidelands" as indicating those affected by the ebb and flow of the tide and lying between the usual or ordinary high and low water marks; and I shall use the term "submerged lands" as denoting those constantly covered by water at usual low tide and forming the beds of navigable streams, or other navigable bodies of water, wherein the tide ebbs and flows.

It is, of course, a truism that no property is owned by the State in a strictly private capacity and in one sense all property owned by the State is held by it in trust for the public interest. In a strict sense, however, in this jurisdiction it is the "submerged lands" and *not "tidelands"*, which have traditionally been held in trust by the sovereign. The rule as to submerged lands is set forth in *State v. Pacific Guano*, 22 S. C. 50, in the following language:

"The state had in the beds of these tidal channels not only title as property, the *jus privatum*, but something more, the *jus publicum*, consisting of the rights, powers and privileges derived from the British crown, and belonging to the governing head, which she held in a fiduciary capacity for general and public use; in trust for the benefit of all the citizens of the state, and in respect to which she had trust duties to perform."

In this connection the majority opinion contains two quotations from which it is seemingly implied that the same trust relationship exists with respect to tidelands. In the first quotation from *State v. Pacific Guano*, Mr. Justice McGowan was speaking only of submerged lands. The second quotation attributed to *State v. Pinckney*, 22 S. C. 484, is, in fact, an incomplete quotation from *Washburn* on Real Property contained in the opinion in *State v. Pinckney*. Along the same line, and of the same import, the opinion in *Cape Romain* contains an incomplete quotation from the

case of *Hardin v. Jordan,* 11 S. Ct. 838, 140 U. S. 371, 35 L. Ed. 428. A reading of the complete text in the *Hardin* case rather clearly shows that it does not support the controversial sentence contained in *Cape Romain.*

Historically in this State from its beginnings in 1670, tidelands, as opposed to submerged lands, were treated by the Lords Proprietors, the Crown and the State of South Carolina as vacant lands subject to grant and private ownership as any other vacant lands, for at least 200 years, until the adoption of certain limitations following the discovery of phosphate beds. Indeed, it is an historical fact that the economic welfare of the State throughout much of its history was largely dependent upon the cultivation of rice lands which were lawfully granted, privately owned tidelands. The pertinent and controlling law of South Carolina has nowhere been more clearly set forth than in the decree of Judge J. J. Maher in the case of *The State v. The South Carolina Phosphate Company, Limited,* alias *The Oak Point Mines,* never appealed from but printed in the appendix to 22 S. C. at page 593, at the suggestion of Mr. Justice McGowan who wrote the opinions in both the leading cases of *State v. Pacific Guano and State v. Pinckney.* In *State v. Pacific Guano Company,* Mr. Justice McGowan referred to Judge Maher's circuit decree as being "able" and quoted in part therefrom. At issue in the *Oak Point Mines* case was the title to tidelands and, after reviewing numerous acts of the legislature, Judge Maher concluded as follows:

"These citations from our statutes are, to my mind, conclusive of the question under consideration. They show unmistakably that lands below high water mark in tidal navigable rivers have been uniformly recognized by the legislature as embraced within the description of vacant lands, and subject as such to location and grant under the general regulations of the land office. This practical interpretation of its own language by the legislature, being in accordance with the comprehensive meaning which it bears in law, there

would seem to be an end to the question whether a grant of land to low water mark in the bed of a tidal navigable stream, issued in conformity to the provisions of the act of 1791, passed the title of the state to the grantor."

An analysis of the opinions in *State v. Pacific Guano* and *State v. Pinckney,* the circuit decrees appealed from in those cases, and the issues involved in those respective cases, show conclusively, I think, a unanimity of opinion on the part of the then members of this Court, the circuit judges participating, and the Attorney General of the State that the law as above set forth by Judge Maher with respect to tide-lands was, at the time, clearly the well established law of South Carolina.

In *Frampton v. Wheat,* 27 S. C. 288, 3 S. E. 462, the Court was concerned with the title to a portion of a tract of 779 acres of marshland west of the Ashley River in Charleston County, the grant to which contained no express reference to low water mark. The grant was taken out in the usual way of granting vacant land, the marshland granted being adjacent to the Ashley River and, of necessity, being in part composed of tidelands. The Court upheld the title of the grantee, citing both *State v. Pacific Guano* and the *Oak Point Mines* cases as authority for the proposition that the State had the right to so grant such marshland. In *Cape Romain* all the grants involved bore dates prior to the decision of the cases hereinabove just cited. It follows naturally that the validity and effect of these grants were controlled by the long established law as recognized and/or set forth in the cited decisions.

It should be borne in mind that the *Cape Romain* case actually arose under the then recently enacted Coastal Fisheries Law, now 1962 Code Secs. 28-751 *et seq.,* which exempted from the operation thereof tidelands theretofore "conveyed by grant of the General Assembly or lawful compact with the State." The real issue in the *Cape Romain* case was title to certain oyster beds. Only a relatively small

portion of the vast acreage called for in the several grants was actually involved in the proceedng. Oysters, of course, thrive only upon submerged land and upon mud banks or flats immediately adjacent thereto, which are covered by water for a greater portion of the time. They do not occur in the vast reaches of marshland far removed from submerged land.

In order for the plaintiffs to sustain their claims to the oyster beds "in the navigable streams", immediately adjacent to the submerged lands owned by the State, it was incumbent upon them to prove title precisely to low water mark. In the final analysis, *Cape Romain* upheld the trial judge's finding of fact, binding upon the Court in this law case if supported by competent evidence, that plaintiffs had failed to prove title to lands between high and low water mark "in the navigable streams" containing the oyster beds upon which the alleged trespasses were committed. The Court did not, I think, even attempt to pass on how much tideland, far removed from the channels of the navigable streams, was, or not, included in the various grants.

It is of some possible significance, I think, that fourteen times in the course of the opinion in *Cape Romain* the issue is stated, in substance, as whether the plaintiff had proved title to "low water mark *in* the navigable streams". The preposition "on", rather than "in", preceding "navigable streams" appears only once near the end of the opinion and in the single sentence hereinabove quoted, which has created so much controversy. Such gives rise to the possible inference that the use of the preposition "on" rather than the preposition "in" was either inadvertent or the result of a clerical or typographical error. Even had the preposition "in", rather than "on" been used, the sentence would still not have been an accurate one, but I think may have given rise to much less controversy. In any event, what accurate and sound meaning this sentence has, if any, which is consistent with the remainder of the opinion in *Romain,* with

the established law prior thereto, and subsequent decisions of this Court, is not at all apparent to me. One thing, however, I think is certain, the author of the opinion and the Court did not intend to say, as is now sometimes argued, that tidelands in this State were not and never had been subject to grant as vacant lands and consequently private ownership.

Indeed, the opinion clearly shows the contrary. The Court dealt with the rules of construction governing such grants; examined the grants in an effort to ascertain the intention of the parties; examined the plats to see if they threw any light upon the intention of the parties; examined the evidence, aliunde the grants and the plats, in an effort to ascertain the intention of the parties, and further examined the evidence as to whether it was sufficient to prove title by adverse possession, none of which would have been necessary if, indeed, the tidelands were not subject to grant and private ownership.

That the Court itself attributed no such meaning to the controversial sentence is, indeed, further clearly shown by the decision in *Jones v. Board of Fisheries,* 161 S. C. 309, 159 S. E. 651, decided just three years after *Cape Romain.* Justice Carter, the author of the *Cape Romain* opinion, and all other justices then sitting (save Chief Justice Watts, deceased) participated in the unanimous opinion in the *Jones* case. Like *Cape Romain, Jones* arose under the Coastal Fisheries Law and involved oyster beds located upon tidelands. *Jones* claimed title to such tidelands, the oyster beds upon which were sought to be leased by one Corey from the Board of Fisheries. The Court approved the procedure followed in the *Cape Romain* case as being appropriate for the purpose of determining title to the particular tidelands, holding, *inter alia,* that Jones had a constitutional right to trial by jury as to his claimed title to the tidelands. Obviously, if not subject to ordinary grant and private ownership, a jury trial as to title would have been an exercise in futility.

While on this vein, the Court as presently constituted has recognized that tidelands are, in fact, subject to grant and private ownership as witnessed by the recent case of *Lane v. McEachern,* 251 S. C. 272, 162 S. E. (2d) 174, and by the case of *State v. Yelsen Land Co.,* 185 S. E. (2d) 897, decided this year, wherein it was held that in a controversy as to the title of tidelands the State, as well as a private claimant thereto, was entitled to a trial by jury.

The cases, both State of Federal, and the enactments of the legislature consistently recognizing that tidelands are and always have been subject to grant and private ownership in South Carolina are so numerous that the citation thereof would render this commentary unduly lengthy. For the benefit of those who might care to pursue the study of the subject, some of the decisions, as well as some of the statutes, in addition to those cited in Judge Maher's opinion in *The Oak Point Mines* case, will be cited in an appendix hereto.

In view, however, of the *dicta* in the Rice Hope case repeating and adhering to the *dictum* from *Cape Romain,* and the intimation of doubt therein as to whether title to tidelands by private owners could be acquired by any method, it may be important to deal with two cases in point, immediately preceding and succeeding *Rice Hope,* which to my mind clearly show the *Rice Hope* utterances to be *dicta.*

The year before *Rice Hope* there was decided the case of *Ehrhardt v. City Council of Charleston,* 215 S. C. 390, 55 S. E. (2d) 344 (1949). Involved in this case were certain tidelands on the east side of the Ashley River within the city limits of Charleston, previously dedicated by the Colonial Government as a common for the City of Charleston, and a statute which authorized City Council to sell portions of such to a corporation for the erection of an apartment building thereon, said statute and sale being upheld. Pertinent to the issue here is the following language of the Court in the Ehrhardt case:

"Historically and judicially, the lands embraced within the Province of South Carolina are vested by succession in the State of South Carolina with complete freedom on the part of the legislative arm of the State, subject only to constitutional limitations, to declare the ownership and use of all public lands within the boundaries of the State, and to provide for the retention and/or disposition of such lands in such manner as the State government might deem proper."

The year following the decision in *Rice Hope,* the Court decided the case of *Beaufort County v. Jasper County,* 220 S. C. 469, 68 S. E. (2d) 421. The issue in the case was whether the transfer of a portion of Beaufort County to Jasper County would leave sufficient land area in Beaufort County to meet the constitutional requirement of minimum size. The decision turned on whether or not marshlands and inland waters, or either, constituted area for the purpose of the constitutional provision. The report of the special referee in the case was confirmed by the circuit judge, and the Supreme Court, in a *per curiam* opinion, adopted the report of the referee and made it the judgment of the Supreme Court, except that the Supreme Court found it unnecessary to decide whether or not "inland waters" constituted area within the meaning of the Constitution.[2] The crux of the decision is found in the following language of the referee adopted by the Court:

"I am of the opinion, and so hold, that the soil under water between high and low water mark constitutes land. See *State v. Pacific Guano,* 22 S. C. 50, (decided in 1884) and decree of Circuit Court Judge Maher in *State v. Oak Point Mines,* reported by order of the Supreme Court in

[2] Reference to the record shows that the term "inland water", as used in the report of the official surveyors, and defined by them, consisted primarily of submerged land but included some tideland, i. e. mud flats, immediately adjacent to submerged land, which did not support vegetation. The bulk of the tidelands involved was embraced within the term "marshland", defined by the surveyors as "the area covered intermittently by water during normal high tides and which supports vegetation in the form of rushes, marsh grass and needle grass."

the Appendix to Volume 22 of South Carolina Reports. It therefore follows that marsh land and inland water likewise constitute land, the subject of state and private ownership."

The appellants took specific exception to the foregoing holding, contending that all tidelands in South Carolina belonged to the State and the title thereof was held by the State in its sovereign capacity for the benefit of all the citizens of the State; hence the tidelands there involved were not subject to claim of control or authority by Beaufort County and that such did not constitute area within the meaning of the constitutional provision. Principal reliance was upon the controversial sentence in *Cape Romain*, with which we are here concerned. To the *contra*, the respondents relied solely upon the circuit decree in the *Oak Point Mines* case, hereinabove discussed, and cited and relied upon by the referee. Here, the year following *Cape Romain* where the issue was actually before the Court, we have a clear reaffirmation of the Oak Point Mines case and a flat rejection by the Court of any thought that the controversial *dictum* in *Cape Romain*, repeated in *Rice Hope* as *dicta*, meant that tidelands were not subject to ordinary grant and private ownership.

It is thus clearly demonstrated that in the year before *Rice Hope* and the year following *Rice Hope*, where the Court was really concerned with the issue, it was not only recognized, but expressly held that tidelands are and always have been subject to grant and private ownership in the State of South Carolina.

While I regard the controversial language of both *Cape Romain* and *Rice Hope* to be pure *dicta*, if such has any real meaning or effect which can be consistently squared with the many acts of the General Assembly and the decisions of this Court, both prior and subsequent to *Cape Romain*, I personally cannot perceive such. If my brethren do so perceive, it is for them to decide whether or not they will communicate their concept, or concepts, to the trial bench and

the bar. Failing such, it may prove of some help, particularly to the trial bench, to know at least that my colleagues *do not contend or intend to hold* that tidelands are not subject to grant and private ownership in this State.

BRAILSFORD, J., concurs.

## APPENDIX

### FEDERAL CASES

*United States v. Lynah,* 106 F. 121 (CCSC) ; affirmed 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539

*United States v. Williams,* 104 F. 50 (CCSC) affirmed 188 U. S. 485, 23 S. Ct. 363, 47 L. Ed. 554

*Chisolm v. Caines,* 67 F. 285 (CCSC)

### STATE CASES

*South Carolina R. Co. v. Toomer,* 9 Rich. Eq. 270 (1857)

*Heyward v. Chisholm,* 11 Rich. 253 (1858)

*Chamberlain v. Northwestern R. Co.,* 41 S. C. 399, 19 S. E. 996 (1894)

*Nathans v. Steinmeyer,* 57 S. C. 386, 35 S. E. 733 (1900)

*West End Development Co. v. Thomas,* 92 S. C. 229, 75 S. E. 450 (1912)

*Gadsden v. Westshore Inv. Co.,* 99 S. C. 172, 82 S. E. 1052 (1914)

*Haesloop v. City Council of Charleston,* 123 S. C. 272, 115 S. E. 596 (1923)

*Intendant and Wardens of Town of Port Royal v. Charleston & W. C. R. Co.,* 136 S. C. 525, 134 S. E. 497 (1926)

*Cheves v. City Council of Charleston,* 140 S. C. 423, 138 S. E. 867 (1927)

COMPREHENSIVE CIRCUIT DECREES UPHOLD-ING PRIVATE TITLES TO TIDELANDS IN-CLUDE:

Decree of Judge Singletary in *Lane v. McEachern,* 251 S. C. 272, 162 S. E. (2d) 174

Unappealed from decree of Circuit Judge Morrison in *State v. East Cherry Grove Realty Co.,* Horry County, 1968

558

Unappealed from decree of Circuit Judge Rosen in *Verona-Pharma Chemical Corp. v. McLeod, et al.,* Berkeley County, 1969

ACTS

Act of 13 August 1783, 7 Stat. 97

Act of 11 March 1786, 4 Stat. 722, No. 1306

Act of 28 March 1787, 5 Stat. 38 No. 1373, Sec. 4

Act of 21 Dec. 1798, 5 Stat. 335, No. 1703

Act of 20 Dec. 1800, 5 Stat. 382, No. 1749

Act of 17 Dec. 1847, 11 Stat. 437, No. 3024

Act of 1868, 14 Stat. 130, Sec. 14, as amended and republished in the Revised Statutes of 1873, page 254, Sec. 6

Act of 22 March 1878, 16 Stat. 558, No. 502

Act of 24 Dec. 1878, 16 Stat. 811, No. 678

Act of 24 Dec. 1878, 16 Stat. 840, No. 131

Act of 9 March 1896, 22 Stat. 222, No. 93

Act of 16 Feb. 1906, 25 Stat. 287, No. 142

Act of 4 March 1909, 26 Stat. 361, No. 211

Act of 20 March 1930, 36 Stat. 1270, No. 748

Act of 13 March 1934, 38 Stat. 1314, No. 749

Joint Resolution 6 May 1938, 40 Stat. 2214, No. 1040

Act of 25 March 1955, 49 Stat. 848, No. 414

Act of 25 March 1955, 49 Stat. 850, No. 415

Act 19 May 1955, 49 Stat. 856, No. 418

Act 17 March 1956, 49 Stat. 2344, No. 965